THE CHICAGO MUTUAL LIFE INDEMNITY ASSOCIATION *et al.*

*v.*

GEORGE HUNT, Attorney General.

*Filed at Ottawa January 25, 1889.*

1. MUTUAL BENEFIT ASSOCIATIONS—*Attorney General—his powers and duties—report from the Auditor.* The power of the Attorney General to file an information against a mutual benefit society, formed under the act of 1883, for the purpose of removing its officers or dissolving the corporation for the causes stated in section 12 of that act, does not depend upon any communication to him from the Auditor, but is within the purview of those powers which are inherent in his office.

2. That section of the act of 1883 relating to mutual aid societies, etc., conferred no new powers upon the Attorney General, but vested the Auditor with the supervision of associations organized under the act, and made it the duty of the Attorney General to take proper legal proceedings whenever the Auditor should communicate to him the fact that an association or its officers had so conducted its affairs as to give occasion for the removal of the officers from their offices, or the closing of the business of the association.

3. The Auditor's communication in respect to a mutual benefit association, transmitted to the Attorney General the report of an examination of the books, papers and affairs of the association by an expert employed for that purpose by the Auditor, and requested the Attorney General to institute proceedings against the corporation. The examiner's report, though not altogether formal in its statement of conclusions, was sufficient to show the existence of one or more of the grounds named in the statute, and this made it the duty of the Attorney General to act.

4. It is only provided that when the Auditor, on examination, finds either that the annual statement of the association is willfully false in some material respect, or that the business of the association has been conducted fraudulently or in violation of some provision of the statute, or that the association has transacted business different from that authorized by its certificate of incorporation, "he shall communicate the fact,"—that is, the fact of having so found,—to the Attorney General. The mode of communication is left entirely with the Auditor. It may, no doubt, be made by communicating the finding alone. So it may be communicated by transmitting the entire report of the examiner, so long as it shows one or more of the necessary findings.

17—127 ILL.

5. Same—*jurisdiction in chancery to dissolve corporation.* In the absence of statutory provision, courts of equity have no jurisdiction to decree the dissolution of a corporation, by forfeiture of its franchises, either at the suit of an individual or at the suit of the State. The court of chancery, however, is by statute expressly authorized, on information filed by the Attorney General, to decree the dissolution of mutual benefit associations, and distribute their effects, and such statute is not unconstitutional merely for the reason the corporation is deprived of a trial by jury.

6. An information filed in a court of equity against a corporation, for the purpose of dissolving the same on any of the grounds named in the statute, is not a criminal proceeding, and therefore required to be carried on "in the name and by the authority of the People," etc. Such an information is not a *quo warranto,* nor its equivalent, but is a civil proceeding of a special statutory character, and is brought for the purpose of protecting and enforcing property rights. Its primary object is not punishment, but to enforce a due administration of the trust reposed by the corporation in its officers.                    .

7. Whenever officers of such corporations have been guilty of fraud, or some material irregularity or violation of law, to the injury of the corporation, or some non-compliance with the provisions of the statute under which the corporation was organized, a court of chancery is authorized to interpose for the preservation of the property rights of members and creditors, and for the protection of the general public, by taking the administration of the affairs of the corporation from the hands of the delinquent officers and placing it in the hands of other suitable persons, or, if the interest of the members or the general public so requires, by winding up its business and distributing its effects, and, as incidental to such relief, by decreeing a dissolution of the corporation.

8. Same—*membership—minors.* Where the certificate of association provides that "no person shall become a member who is under ten or over seventy years of age," and the statutes are silent on the subject, it will not be a violation of any law for such an association to take into membership minors who advance their initiation fee and other charges required.

9. The fact that a minor member may avoid his contracts, is no objection to his admission as a member in a mutual benefit association, as payment of assessment dues is not compulsory on any member, but purely voluntary. If the infant performs the conditions prescribed in the certificate of membership, he, the same as an adult, becomes entitled to the benefits thereby secured. If he fails, his membership ceases, just as that of an adult, and that is all.

10. Same—*diversion of mortuary fund—as a ground for dissolving.* The by-laws of an association required all persons becoming members

to pay an admission fee, the annual dues for one year, and one advance mortuary assessment, and the money derived from this assessment was set apart and treated as a mortuary fund. Section 6 of the statute relating to such corporations, provides that "no part of the funds collected for the payment of death benefits shall be applied to any other purpose." By a resolution adopted, this fund was used in defraying current expenses, so that it was largely deficient: *Held,* that the use of the mortuary fund for other purposes than paying on deaths was such a violation of law as to authorize the court to dissolve the society and wind up its affairs. The use of such fund for current expenses is not only a fraud upon the members, but a clear, palpable and inexcusable violation of law.

11. The certificate of an association provided, as a part of its plan, that twenty-five per cent of the assessments for death benefits should constitute a guaranty fund, to be known as the "Tontine Reserve Fund," and that for the apportionment of such fund the association should be divided into classes, by years, the portion of such fund contributed during ten years by members of each class, together with the accumulations, to be apportioned equitably among the surviving persistent members of that class: *Held,* that such disposition of the reserve fund was in direct violation of the letter and spirit of section 8 of the State law relating to such corporations.

12. The association, in order to obtain applications for membership, held out to the public that it had a legal right to, and would, at the option of a member, refund to him in cash, at the expiration of the period of ten years, all the reserve fund to which he would be equitably entitled, in accordance with the plan upon which that fund was being accumulated: *Held,* that such a payment would be unlawful under section 8 of the statute, as well as for the further reason that it would be an allowance to the member of money from the association as a profit.

13. SAME—*election of officers—improper use of proxies.* By the charter or organic law of a mutual benefit association, the management and control of its affairs and business were vested in eight trustees, who appointed a manager and secretary. The secretary had printed on each application for membership then used, a blank proxy, authorizing the persons whose names should be inserted, to act and vote for the member, and underneath it was a request to the applicant to sign it in blank, to be filled up by the secretary. By this means the secretary had himself and the manager elected by the members, and controlled the election of the trustees, and the latter were controlled by the secretary: *Held,* that the action of the secretary was a clear abuse of the opportunities his official position gave him, a palpable subversion of the rules of law, as well as a fraud on the members, and justly subjected the association to proceedings by the Attorney General for its dissolution.

14. Same—*false numbering of certificates of membership.* Such an association, through its officers, issued certificates of membership numbered, but not consecutively, a particular certificate having thus a number very much larger than the total number of certificates issued up to that date : *Held*, on information to dissolve the association, that such mode of issuing certificates had a direct tendency to deceive members receiving certificates, as to their value, and was a fraud on them, whether so intended or not.

15. Same—*false reports to Auditor is ground for dissolution.* A false report of the financial condition of the association was made to the Auditor of Public Accounts, and the fact that the officers were misappropriating the advance mortuary assessments was concealed from him, and false answers to questions by the Auditor to the association were returned. In such answers the suppression of a material fact called for by a question makes the answer as essentially false as the affirmation or assertion of an untruth.

16. Same—*failure to keep books of account.* The failure of the officers of a mutual benefit association to keep correct and intelligible books of account, whether such failure results from design, carelessness or want of skill, is a serious breach of official duty. Such officers are trustees, and it is a duty of primary importance, incumbent on all trustees, to keep proper accounts of trust funds, for unless that is done the beneficiaries of such fund have no safety in their rights, and are liable to be defrauded.

17. Action—*to recover back money paid by infant on contract.* If an infant advances money upon a voidable contract, which he afterward rescinds, he can not recover this money back, because it is lost to him by his own act, and the privilege of infancy does not extend so far as to restore this money, unless it was obtained by fraud.

Appeal from the Circuit Court of Cook county ; the Hon. M. F. Tuley, Judge, presiding.

This was an information in chancery, filed by the Attorney General, on behalf of the People of the State of Illinois, against the Chicago Mutual Life Indemnity Association and its officers, praying that said officers be required to show cause why they should not be removed from office, or the business of the association closed, and that if it should appear that said officers or any of them had been guilty of fraud, or any material irregularity or violation of law to the injury of the association, or of non-compliance with any of the provisions of the act

under which the association was organized, the court should decree a removal from office of the guilty party or parties, and the substitution of a suitable person or persons to serve until the regular annual meeting, or until a successor or successors should be regularly chosen or elected; or, if it should appear to the court that the interests of its members or the general public so require, that it decree a dissolution of the association and a distribution of its effects.

The information alleges that said association is a corporation organized January 13, 1885, under the "Act to provide for the organization and management of corporations, associations or societies for the purpose of furnishing life indemnity or pecuniary benefits to widows, orphans, heirs, relatives and devisees of deceased members, or accident or permanent disability indemnity to members thereof," approved June 18, 1883; that said association entered upon the exercise of its corporate franchise and the transaction of business under its certificate of organization on or about January 13, 1885, and had continued the same until the date of filing said information, its principal office being located in the city of Chicago; that on or before March 1, 1887, its president and secretary filed with the Auditor of Public Accounts a statement under oath of its business for the year ending December 31, 1886, as required by law, showing its financial condition, assets, liabilities, total amount of indemnity in force, number of members, number whose membership had terminated during the year and cause thereof, total receipts and sources thereof, total expenditures and object thereof, and the average amount paid on each certificate; that said statement was willfully false and untrue, and that the Auditor so found on examination of the books and papers of the association and such other examination as he had deemed necessary; that the business of the association had been conducted fraudulently and in willful violation of the provisions of said act, and that the association had transacted business different from that authorized by its certificate

of incorporation; that the Auditor had communicated such facts to the Attorney General as required by law, and that the Attorney General, in pursuance of the duty imposed upon him by law, applied to the court for relief, according to the statute in such case made and provided, and for cause of such application further and more particularly showed:

That in pursuance of a resolution of the board of trustees of the association adopted November 19, 1886, a new department called the "Industrial Department" of the association had been established and was still in active operation, wherein members had been and were accepted at any age between the limits of ten and sixty years, and benefit certificates issued to them in sums less than $1000 as well as in sums above that amount; that benefit certificates had been issued by said department to persons under lawful age, wherein the association pretended to contract with such persons in consideration of statements, warranties and agreements made by them with the association; that over one hundred benefit certificates, representing an aggregate insurance of $87,555, had been issued by said department from which no revenue whatever had been received by the association; all of which acts were in willful violation of the provisions of said act, and constituted a fraud upon all its members who had become such in good faith.

That no true record had been kept of the money affairs of the association; that many of its receipts had never been entered upon its books of account or any record thereof kept; that it was impossible to ascertain from the books and records of the association what funds had been collected for the payment of death benefits, or for the accumulation of its surplus or guarantee fund; that no trial balance, or even a cash balance, had ever been made from its books of account, and that it had never been possible to make either balance on account of the want of the necessary records from which to make them.

That the by-laws of the association provided for the accumulation of a surplus, general or guarantee fund, to be known as the "Tontine Reserve Fund," by setting apart twenty-five per cent of the net amount raised by assessments for death benefits, to be invested as required by said act, and to be applied in payments of future assessments as required by law, or otherwise used for the promotion of the objects for which said reserve was specially provided and set apart, at the option of the member; but that in fact the association, its officers, trustees and agents, in violation of the provisions of the by-laws and of said act, had fraudulently advertised and held out to the world that the association was empowered by law to and would, at the option of any member, refund to him in cash, at the expiration of the period of ten years from the date of his certificate, all of the "Tontine Reserve Fund" and its accumulations to which such member should at that time be entitled, and that divers persons, relying upon such false and fraudulent representations, had been induced to and had become members of the association.

That on the back of blank applications for membership in the association was printed a blank proxy constituting the person whose name should be inserted therein the member's proxy to vote for him at all meetings for the election of trustees, and upon all questions arising before the association; and subjoined to such blank proxy was printed a request or direction to the applicant "to sign the proxy in blank, to be filled in by the secretary;" that all applicants were requested to sign such proxy, and that the signing of it was made a condition to the admission of the applicant to membership in the association; that by reason of the ignorance of the effect of the proxy, the large majority of the applicants had signed and were signing the same, and that by reason thereof and by means of the fact that it was impossible in the nature of things for many of the members to attend the meetings of the association, the secretary had it in his power alone to control and

that he did control all elections for trustees of the association contrary to equity, and in fraud of the rights of the members.

That certain amendments to the articles of association claimed to have been adopted at a meeting of the members held January 19, 1886, provided that the other officers of the association should be elected by the trustees, but that the secretary and manager should be elected by the members at the annual meeting, at which the votes should be by ballot, and each member entitled to one vote, either in person or by proxy; that by reason of such amendment, and of the proxies signed in blank by applicants for membership and held and controlled by the secretary, he had it in his power alone to control and did alone control the election of his own successor and that of the manager; that said power and control in effect removed the secretary and manager from all control by the trustees or members of the association, and made the annual election an empty form; that the secretary and manager were the active officers and transacted the business of the association with its members and the public, and that the affairs of the association were therefore at the mercy of the secretary and manager, and had been and were grossly mismanaged and fraudulently transacted, as in other parts of the information stated and shown.

That the manager and other officers of the association, without any power or authority so to do, have pretended and do habitually pretend to waive and alter the conditions of the benefit certificates, after the same have been issued, by indorsing written stipulations thereon, and falsely and fraudulently represented that said stipulations were binding on the association.

That in its printed advertisements and circulars the amount of insurance or indemnity covered by the benefit certificates was greatly exaggerated, and its liability for death losses greatly understated; that said advertisements and circulars were intended and used for general circulation, and were calculated to and did deceive the public, and that divers persons relying thereon had been and were being induced to become members.

That for the purpose of falsely and fraudulently representing the condition of the affairs of the association, the benefit certificates issued by it had been and were being numbered with numbers much larger than the number of benefit certificates actually issued.

That no assessments had been made for certain deaths which had occurred among the members of the association in good standing, and that by reason thereof certain death losses had not been paid, to the damage and loss of the beneficiaries named in the certificates of such deceased members; that to avoid the payment of its death losses, the association had permitted suit to be brought against it by such beneficiaries, and that in such suits it had set up fictitious and frivolous defenses to delay and defeat a recovery.

That the "Tontine Reserve Fund" above mentioned had never been set apart or accumulated out of the assessments levied on the members of the association for death losses, nor out of any other funds, nor had any such fund been invested in any of the securities or in the manner required by said act; that no accounts whatever had been kept of the amount of money due or belonging to such fund out of the receipts of the association, nor had any attempt been made by the association or its officers to invest such fund as by law required; that representations had been made by the association and its officers of the existence of such fund, but that such representations had been and were wholly false and fraudulent.

That no membership fees had been accounted for on the books of the association; that large commissions to agents were being paid out of such membership fees, and that whatever remained from that source and whatever income had been or was received from assessments for expenses were being appropriated by the officers and directors of the association as their own personal perquisite without accounting therefor, and that the association and its members were receiving no benefit from and had no voice in the disposition of such receipts.

That on or about February 16, 1886, the trustees of the association passed a resolution authorizing the manager to use for proper expenses of managing the association, the advance mortuary assessments, to be replaced to the credit of the association from annual dues as soon as expedient, and that the legitimate expenses of the trustees incurred in attending the meetings of the association be considered proper expenses as aforesaid; that in pursuance of this resolution and otherwise, a large part of the funds collected by the association for the payment of death benefits had been applied by the manager for other purposes, in willful and direct violation of said act, and of the provisions of the certificate of incorporation and by-laws of the association, and in gross fraud of all its members and of the beneficiaries named in the benefit certificates; that by reason of such wrongful application and expenditure of said funds there was a shortage in the mortuary fund and the "Tontine Reserve Fund" of more than $1098.87; that the funds of the association had been thereby reduced so that it had been and was unable to meet its death losses, and was largely in arrears to the beneficiaries.

That the association had never since its organization fulfilled the purpose for which it was created; that it had issued benefit certificates for large amounts of indemnity, in which however its liability was limited to the amount contributed to the mortuary fund by one assessment upon all who were members at the time of the death of the member named in the certificate, and that the membership of the association had never been and was not large enough to pay all or nearly all of the amount named in a large portion of the certificates by means of one assessment; that the whole number of certificates pretended to be in force was only six hundred; that of that number about one hundred were in the "Industrial Department" of which a large proportion were issued to persons under lawful age; that the amount which would be realized for the mortuary fund by one assessment, if they all paid, would be

about $2400, and that if twenty-five per cent be deducted for the "Tontine Reserve Fund," there would remain to apply to the payment of a death loss only about $1800, and in spite of which fact the association had been for two years and was still issuing benefit certificates naming therein indemnities of $3000 and $5000 and upwards, and representing that such amounts would be paid upon the death of the member named in the certificate; that no care had been taken to apply the assessments for the mortuary and tontine reserve funds to the purposes for which they were collected, as required by law, or to keep any account of the same, but that said funds had been applied to other purposes as aforesaid; that as a consequence, of the five death losses which had occurred, only two had been paid and those only in part; that the association was in fact insolvent; that in the face of these facts the association, its officers, trustees and agents, were continuing to solicit and were inducing divers persons to become members of the association, by falsely and fraudulently representing that it was financially sound and solvent, its membership large and increasing, its death losses small and fully paid, and its affairs generally in a flourishing condition, all of which acts and representations were contrary to public policy and to equity and good conscience.

Answers to the information and replications were filed, and the cause coming on to be heard on pleadings and proofs, a decree was entered finding the facts to be substantially as stated in the information, and also finding that the interests of the members of the association and the general public required that said association should be dissolved and its effects distributed, and it was thereupon ordered and decreed that said association be ousted of its franchises and be dissolved, and that its effects be distributed equitably, after first paying the costs of this proceeding. A receiver of the effects and property of the association was appointed, and the officers and trustees of the association were perpetually enjoined from per-

forming any further duties or exercising any further rights as officers or trustees of the association and from transacting any business in its behalf. From said decree the association and certain of its officers have appealed to this court.

Mr. Joseph N. Barker, and Mr. Arthur W. Windett, for the appellants:

The proceeding is highly penal—*quasi* criminal,—the information requiring the same distinctness, certainty and precision of averment as an indictment. *Lavalle* v. *People*, 68 Ill. 252.

Section 12 of the act of 1883 provides that judgment of removal from office shall forever disqualify such person from holding a like position.

Such a prosecution must be carried on in the name of the People, and not in the name of the Attorney General. Const. art. 5, sec. 26; *Donnelly* v. *People*, 11 Ill. 552; *People* v. *Railroad Co.* 13 id. 66; *Wight* v. *People*, 15 id. 417; *McFadden* v. *Fortier*, 20 id. 509; *Leighton* v. *Hall*, 31 id. 108; *Bunn* v. *People*, 45 id. 397; *Railroad Co.* v. *Herr*, 54 id. 356.

That the acts of 1883 and 1887, providing for suit, in the name of the Attorney General, in cases involving the forfeiture or deprivation of personal, civil or political rights, without a trial by jury, is unconstitutional and void, see *Hay* v. *People*, 59 Ill. 94.

The Attorney General could only act upon a report of matters of fact, for which the Auditor should be officially and personally responsible, and not upon matters of opinion. The statute being in derogation of the common law, is to be strictly construed. *Haskins* v. *Haskins*, 67 Ill. 446; *Schaumtoeffel* v. *Belm*, 77 id. 569.

It is not shown that the holding of the proxies has done or caused any damage to the association or any member thereof. The mere possession of such a power, without any abuse of it being shown, is not sufficient to authorize a decree of dissolution.

The association was authorized to receive minors as members. It was bound by such contracts. Minors could hold it by, and enforce against it, such liabilities; and they could themselves become conditionally liable and bound toward it. *Coles* v. *Pennoyer*, 14 Ill. 161.

The association was authorized by section 129, page 1349, (Starr & Curtis,) being the act under which it was organized, in claiming the right, at the end of ten years, to refund, at the option of members, the tontine reserve.

The company had the right to use the advance mortuary assessments, and moneys derived therefrom, to pay expenses. By-laws, sec. 1.

Mr. GEORGE HUNT, Attorney General, Messrs. CAMPBELL & CUSTER, and Mr. JOSEPH A. GRIFFIN, for the appellee:

The statute does not expressly authorize persons under legal age to become members, and no such inference should be drawn to overturn the established rule of the common law as to disabilities of minors. Neither does the approval of the Auditor avail, as he is not invested with any law-making power.

The certificate of membership is a contract with the member that the association shall pay to the beneficiary, and also that one-fourth of the sum raised by mortuary assessments shall go into the tontine fund, and if the certificate, for any cause, becomes void, all moneys, and all interest in the corporate property, shall be forfeited to the association. *Cole* v. *Insurance Co.* 18 Iowa, 425; *Benefit Association* v. *Spies*, 114 Ill. 467.

While neither the association nor a member can compel other members to pay an assessment, yet when it is once paid, the members have a property interest in the moneys so paid. *People* v. *Golden Rule*, 114 Ill. 34.

The using of the mortuary fund for the payment of expenses was a breach of the members' contracts. This contract was, that all advance mortuary assessments should go to the mor-

tuary and tontine funds, in the same proportion their own had gone to such funds.

The tontine scheme is contrary to the law, as it provides for paying living members not only the balance of moneys paid by them, but the profits thereon. *Commercial League* v. *People*, 90 Ill. 166; *State ex rel.* v. *Benefit Association*, 23 Kan. 499.

The issue of policies numbered hundreds and thousands more than had been actually issued, was a fraud in fact, if not in intent, and the result was the same to those deceived.

The report to the Auditor was false in not expressing the truth. The suppression of the truth, under the circumstances here shown, was as much a violation of the law requiring truthful answers to the questions, as any affirmative assertion of a fact which had no foundation whatever, would have been. *Directors* v. *Kish*, 2 H. L. (Eng. and Irish App.) 99; *Oakes* v. *Tarquard*, id. 325.

An information by the Attorney General is a proceeding in chancery, and is not a criminal information, or information in the nature of a *quo warranto*, and hence the rules of pleading and practice applicable to the latter have no application to the former. Mitford's Eq. Pl. 117, 196, 197; Cooper's Eq. Pl. 99-107; 1 Daniell's Ch. Pl. and Pr. 2, 3; *Attorney General* v. *Butler*, 123 Mass. 304; *Attorney* v. *Parker*, 126 id. 221.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

This is a proceeding instituted by the Attorney General under the 12th section of the act of 1883 providing for the organization and management of mutual benefit societies. (1 Starr & Curtis' Stat. 1348.) That section provides that whenever any corporation, association or society organized or having transacted business under the provisions of said act, shall neglect or refuse to make its annual statements as required by the act, or whenever the Auditor shall find, upon

examination as provided in section 10 of the act, that any willfully false or untrue statements in any material respect have been made, or that the business of the corporation, association or society has been conducted fraudulently, or in willful violation of any of the provisions of the act, or that the corporation has transacted business different from that authorized by its certificate of incorporation, "he shall communicate the fact to the Attorney General, whose duty it shall be to apply to the circuit court where its principal office is located, for an order requiring the officers, or directors, trustees or managers of such corporation, to show cause why they should not be removed from office, or its business closed; and the court shall thereupon hear the allegations and proofs of the respective parties, and if it shall appear to the satisfaction of the said court that any one or more of them have been guilty of fraud or any material irregularity or violation of law to the injury of said corporation, association or society, or of noncompliance with any of the provisions of this act, the court shall decree a removal from office of the guilty party or parties, which decree shall forever debar him or them from holding a similar office, and shall substitute a suitable person or persons to serve until the regular annual meeting, or until a successor or successors are regularly chosen or elected; or if it shall appear to said court that the interests of its members or the general public so require, the court may decree a dissolution of such corporation, association or society, and a distribution of its effects."

Counsel for the association insist that the Attorney General was without authority to institute the present proceeding, because, as they allege, no sufficient report was made to him by the Auditor of Public Accounts. The contention is, that such report was jurisdictional, or rather a condition precedent, and that until it was made, the Attorney General had no power to act. And it is further argued that, to justify the institution of proceedings, the report of the Auditor should have contained

not merely the conclusions to which he arrived from an examination of the affairs of the association, but also the facts upon which those conclusions were founded.

We are of the opinion that the power of the Attorney General to file the information in no way depended upon the communication made to him by the Auditor, but came within the purview of those powers which are inherent in his office. See *Hunt* v. *Chicago Horse and Dummy Railway Co.* 20 Ill. App. 282; *Same case,* 121 Ill. 638. The section of the statute under consideration conferred no new *powers* upon him, but vested the Auditor with the supervision of associations organized under the statute, and made it the *duty* of the Attorney General to take proper legal proceedings whenever the Auditor should communicate to him the fact that an association or its officers had so conducted as to give occasion for the removal of the officers from their offices, or the closing of the business of the association.

But even if this were otherwise, the communication by the Auditor to the Attorney General was sufficient to answer the requirements of the statute. The principal objection urged to it is, that it stated conclusions and not facts. In this counsel are clearly mistaken. The Auditor's communication transmitted to the Attorney General the report of an examination of the books, papers and affairs of the association by an expert employed for that purpose by the Auditor, and requested him to institute proceedings under the section of the statute above quoted. The examiner's report consisted in part of a detailed statement of the facts ascertained on the examination, and copies of forms and documents used by the association in the management of its business, and in part of deductions and conclusions drawn by the examiner therefrom. It is perhaps not altogether formal in its statement of conclusions, but when considered either in relation to the facts stated or the conclusions drawn, it is clearly sufficient to show the existence of one or more of the grounds enumerated by the statute upon

which it became the duty of the Attorney General to institute proceedings against the association.    It should be observed that no particular form is prescribed by the statute for the communication by the Auditor to the Attorney General.    It is only provided that when the Auditor, on examination, finds, either that the annual statement of the association is willfully false in some material respect, or, that the business of the association has been conducted fraudulently or in violation of some provision of the statute, or, that the association has transacted business different from that authorized by its certificate of incorporation, "he shall communicate the fact," that is, the fact of having so found, to the Attorney General.    The mode of making the communication is left entirely with the Auditor.    It doubtless may be made by communicating the finding alone, but we see no objection to the mode adopted in this case, viz., by transmitting to the Attorney General the entire report of the examiner, so long as it shows one or more of the necessary findings.

It is urged that a court of chancery has no jurisdiction. This contention is based upon the theory that the proceeding is in the nature of a *quo warranto* to remove the officers of the association from office and impose upon them the penalty prescribed by the statute, viz., that of debarring them from afterward holding a similar office, or, to oust the association of its corporate franchise and distribute its effects.    It is said that the proceeding, so far at least as it relates to the officers of the association, is highly penal, and so not within the proper jurisdiction of a court of equity.    It will be noticed that the relief provided by the statute is in the alternative, viz., the removal of the officers from office and the appointment of others in their places, the decree to operate, as a legal consequence, to debar the persons removed from office from afterward holding a similar office ; or, the dissolution of the association and the distribution of its effects.    As the court saw fit to apply the latter remedy only, we have nothing to do

18—127 Ill.

with the question of its jurisdiction to administer the former, and the case may be decided precisely as though the dissolution of the association and the distribution of its effects was the only mode of relief provided by the statute.

It is doubtless the rule that, in the absence of statutory provisions, courts of equity have no jurisdiction to decree the dissolution of a corporation, by forfeiture of its franchises, either at the suit of an individual or at the suit of the State. *Attorney General* v. *Utica Ins. Co.* 2 Johns. Ch. 370 ; *Slee* v. *Bloom,* 5 id. 366 ; *State* v. *Merchant's Ins. Co.* 8 Humph. 234 ; *Attorney General* v. *Bank of Niagara,* 1 Hopkins' Ch. 334 ; *Doremus* v. *Dutch Reformed Church,* 3 N. J. Eq. 332 ; *Doyle* v. *Peerless Petroleum Co.* 1 Edw. Ch. 83 ; *Strong* v. *McCagg,* 55 Wis. 624 ; 2 Morawetz on Corporations, sec. 1040. But in the cases holding this rule, it is uniformly admitted, whenever the question has arisen, that jurisdiction to decree the dissolution of a corporation may be conferred upon courts of equity by statute.

In this State, statutes have been passed vesting courts of equity with jurisdiction to decree the dissolution of corporations in a great variety of cases. Thus, by the 25th section of the statute in relation to corporations, courts of equity are given full power, on good cause shown, as a portion of the relief provided for by that section, to dissolve or close up the business of a corporation organized under that act, and to appoint a receiver of its effects. 1 Starr & Curtis' Stat. 618. Similar power is given by the 25th section of the statute in relation to fire, marine and inland navigation insurance companies. Id. 1324. Also by the act of February 17, 1874, in regard to the dissolution of insurance companies. Id. 1353. Under neither of these statutes has the power of courts of equity to decree the dissolution of corporations in proper cases been seriously questioned, but when properly invoked, it has been uniformly exercised. *St. Louis, etc., Mining Co.* v. *Mining Co.* 116 Ill. 170 ; *Life Association of America* v. *Fassett,* 102

id. 315. Such power was directly affirmed by this court, after full and elaborate consideration, in *Ward* v. *Farwell*, 97 Ill. 593, and *Chicago Life Ins. Co.* v. *Auditor*, 101 id. 82, and the question therefore is no longer an open one. The point made by counsel that, by transferring jurisdiction of suits to dissolve corporations from courts of law to courts of equity, the corporations affected are deprived of the right of a trial by jury guaranteed by the Constitution, is fully and satisfactorily answered by the opinion of the court in *Ward* v. *Farwell, supra,* and the argument there made need not be repeated here.

Nor is the position well taken that the present suit is in the nature of a criminal prosecution, and therefore required by section 33, article 6, of the Constitution, to be carried on "in the name and by the authority of the People of the State of Illinois." It is true a *quo warranto* has been held to be a criminal proceeding within the meaning of the Constitution, but this is neither a *quo warranto* nor its equivalent. It is a civil proceeding of a special statutory character, and is brought for the purpose of protecting and enforcing property rights. Its primary object is, not to punish the corporation or its officers for an abuse of the corporate franchise, but to enforce a due administration of the trust reposed by the corporation in its officers. Accordingly, when those officers have been guilty of fraud or some material irregularity or violation of law, to the injury of the corporation, or some non-compliance with the provisions of the statute under which the corporation was organized, a court of chancery is authorized to interpose for the preservation of the property rights of members and creditors and for the protection of the general public, by taking the administration of the affairs of the corporation from the hands of the delinquent officers and placing it in the hands of other suitable persons, or, if the interests of the members or the general public so require, by winding up its business and distributing its effects, and as incidental to such relief, by decreeing a dissolution of the corporation. It will thus be seen

that the proceeding partakes of none of the elements of a criminal prosecution, but is purely a civil remedy, and one which falls directly within the proper domain of chancery jurisdiction.

The information contains a large number of charges against the association and its officers of acts and modes of proceeding which are alleged to be unlawful. The defendants' answer, as a general rule, denies the charges thus made, though it at the same time admits some of the acts alleged and insists that such acts were not unlawful. We have thus to determine from the pleadings and evidence whether any and which of the charges made are established, and whether the charges so established are legally sufficient to warrant the present proceedings and decree.

One of the charges upon which considerable stress is laid and upon which the court below found in favor of the Attorney General is that of admitting minors to membership. The statute requires that the certificate of association shall state, among other things, "the limits as to age of applicants for membership," and in pursuance of that requirement, the certificate of association in this case, which was submitted to and approved by the Auditor and by him transmitted to the Secretary of State and upon which the latter issued the certificate of organization, provided that "no person shall become a member who is under ten or over seventy years of age." It appears from the evidence and the defendants' admissions that, of about six hundred members belonging to the association, something over sixty were admitted under the age of twenty-one years, some of them being but little past the minimum age. Was their admission unlawful?

The statute under which the association was organized is silent on the subject, nor do we find any statute which either expressly, or, so far as we can discover, by implication, either permits or forbids their admission to membership. If then minors are ineligible, such ineligibility arises from some prin-

ciple growing out of the nature and objects of these associa-
tions, or the policy of the law applicable thereto.

The contention is, that the certificate of membership is a
personal contract between the member and the association,
and that, as an infant is capable of making only a voidable
contract, his admission to membership is a violation of those
principles of mutuality which lie at the basis of mutual benefit
societies. We may admit in the broadest sense that these so-
cieties are founded upon the principle of entire mutuality in
relation to burdens as well as benefits, yet we are unable to
see how that principle places the membership of infants upon
any footing different from that of adults. While the certificate
of membership is a contract, such contract, in the absence of
express stipulations to the contrary, is purely unilateral. It
may be enforced against the association where the member
has performed all the prescribed conditions, but none of its
stipulations are enforcible against the member. If he fails to
pay his assessments or dues, or does any act forbidden by
the certificate of membership, the certificate becomes void and
the membership ceases. But the making of an assessment
or the maturing of dues does not make the member a debtor
to the association, so as to authorize it to bring a suit for its
recovery in case of his neglect or refusal to pay. Payment is
left wholly to his discretion. The contract then not being one
which has the legal effect of binding him to the payment of
any money or the performance of any condition, we can not
see how it can be at all important whether it is voidable or
otherwise. Performance is no more left to the option of the
member where the contract is made by an infant than when
made by an adult. If an infant performs the conditions pre-
scribed in the certificate, he, the same as an adult, becomes
entitled to the benefits thereby secured. If he fails to per-
form, his membership ceases, and that is all. We do not as-
sent to the view that, as a further consequence of his disability,
he may recover back the dues and assessments he may have

already paid. "If an infant advances money on a voidable contract which he afterwards rescinds, he can not recover this money back, because it is lost to him by his own act, and the privilege of infancy does not extend so far as to restore this money unless it was obtained by fraud." 1 Parsons on Contracts, 332.

Nor are we able to see any force in the suggestion that minors should not be admitted to membership because of their incapacity to act as trustees, or to perform the duties of members at corporate meetings, such as consulting or giving advice for the mutual benefit of the members, voting for officers, and the like. We know of no reason why the capacity to act as trustee should be a necessary qualification for membership. If a sufficient number of members possess the requisite capacity, so as to afford the members a reasonable and proper range of choice in the selection of trustees, the admission of others who are not thus qualified can work no injury to anybody. It will not be claimed that the want of the requisite intelligence or business experience on the part of an adult to qualify him to act as trustee would render him ineligible to membership, but these are quite as essential to the proper discharge of the duties of trustee as mere legal capacity. There would seem to be no legal obstacle in the way of minors taking part in corporate meetings, consulting, advising or even voting. The only objection to their doing so grows out of their inexperience and the immaturity of their judgments, but these are disqualifications which are not necessarily confined to persons, under the age of twenty-one years, and no one would allege them as a legal bar to the admission of an adult to membership.

It should be remembered that in this proceeding we have nothing to do with the good or bad policy, in an economic or business point of view, of admitting minors to membership. Whether it was wise or unwise is not the question. We have only to determine whether it was such a violation of the rules or policy of the law as should subject the association to disso-

lution. On this point we are unable to agree with the learned chancellor before whom the cause was heard, our opinion being that, so far as this charge is concerned, the decree is not sustained.

But there are other charges, either admitted or proved, of acts on the part of the association and its officers, which constitute such violations of law as warrant the dissolution of the association. Prominent among these is that which relates to the use by the association of the advance mortuary assessment for the payment of current expenses. The by-laws of the association provided that all persons becoming members should be required to pay a certain admission fee, the annual dues for one year, and one advance mortuary assessment. The money derived from this assessment was set apart and treated as a mortuary fund until February 16, 1886, at which date the trustees adopted a resolution authorizing the manager to use the advance mortuary assessment in defraying current expenses, the same to be replaced to the credit of the association from annual dues as soon as expedient. After the adoption of this resolution, the advance mortuary assessment or the larger portion of it was used by the manager for expenses, and as a consequence, at the time of filing the information, there was a large deficiency in the mortuary fund, if the advance mortuary assessment is to be treated as a part of that fund. The defendants admit the adoption of said resolution and the subsequent use of the advance mortuary assessment as alleged, but contend that the association had the legal right to so use it.

The 6th section of the statute under which the association was organized provides that, "no part of the funds collected for the payment of death benefits shall be applied for any other purpose." There can be no doubt that the advance mortuary assessment was money collected for the payment of death benefits, within the meaning of the statute. That is the clear import of the name under which it was collected, and if it was

in fact designed for any other purpose, the very name and pretense under which the money was demanded, were of themselves a palpable fraud upon the members paying it. Not only is this so, but the circulars and other publications distributed by the association for the purpose of advertising its scheme and inducing those who might read them to apply for membership, represented that all expenses were to be paid out of the membership fees and the annual dues, and such was doubtless the understanding of most if not all who became members. The use of the money thus obtained for current expenses was not only a fraud upon the members, but a clear, palpable and inexcusable violation of law.

The 8th section of said statute provides that associations organized thereunder may provide by their by-laws for the accumulation of a surplus, general or guarantee fund, to be invested in a manner particularly specified, and that such fund, when so set apart and invested shall, with the increase thereof, belong to such association and not to the directors, trustees, managers or officers thereof, "and shall be used only for mortuary benefits, without assessment, or applied in payment of future assessments, or otherwise used for the promotion of the object or objects for which such funds are specially provided and set apart, and such use shall not be deemed or construed to mean a profit received by members within the meaning of the statutes of this State."

The defendants' certificate of association provided, as a part of the plan upon which the association was formed, that twenty-five per cent of the assessments for death benefits should constitute a guaranty fund to be known as the "Tontine Reserve Fund," and that for the apportionment of such fund, the association should be divided into classes by years, the portion of such fund contributed during ten years by members of each class, together with the accumulations, to be apportioned equitably among the surviving persistent members of that class. We think it clear that such disposition of the reserve fund was

in direct violation of the letter as well as the spirit of the statute. The moneys from which it was to be accumulated, viz., those collected for the payment of death benefits, were dedicated and set apart by the statute to that purpose alone, and any other application of them was expressly prohibited. It follows that a reserve fund accumulated from that source could be lawfully applied to no other purpose than that of paying death benefits. But in addition to this, the section of the statute permitting the accumulation of such fund expressly provided that the fund should belong to the association, a provision which necessarily excludes the idea of its belonging to or being distributable among the persistent surviving members of a particular class. Doubtless it was the intention of the statute, in providing for the accumulation of a reserve fund, to place the association in such condition as to be able to pay its death benefits with greater promptness and certainty, and perhaps to provide against unexpected drafts upon its resources by extraordinary mortality caused by the visitation of epidemic diseases, when the ordinary death assessments would be likely to prove insufficient. It thus appears that the plan upon which the association was formed, so far as it relates to the disposition to be made of its reserve fund, was in direct violation of law.

The information charges that the association, in order to obtain applications for membership, held out to the world that it had a legal right to and would, at the option of a member, refund to him in cash, at the expiration of the period of ten years, all the reserve fund to which he would be equitably entitled, in accordance with the plan upon which that fund was being accumulated. This charge is admitted, and the claim is made that the association had the right to offer and make such payment. That such payment would be unlawful follows from what has been said, as well as from the further reason that it would be an allowance to the member of money from the association as a profit. The payment promised, it

will be observed, was not of the unexpended balance of the assessment paid by the member, or such balance and interest, but the equitable share of the member as one of the surviving persistent members of the particular class to which the fund accumulated at the expiration of the tontine period was to belong. That share would manifestly be increased by the lapsing of the interest in the fund of all members who during the period should cease to be such by delinquency or otherwise, thus clearly introducing into the proposed payments the element of profit. The statute expressly forbids the receipt by members of associations organized thereunder of any money as profit, and it therefore follows that the payment promised to members at the expiration of the tontine period was in direct violation of its terms.

We are also of the opinion that there was a clear violation of the spirit if not of the letter of the statute in the mode adopted for the election of officers, by which the virtual control and management of the association was taken from the board of trustees and vested in the manager and secretary. The statute provides that the affairs of all associations organized thereunder shall be managed by not less than five directors, trustees or managers, who shall be elected from and by the members, at such time and place and for such period not exceeding three years, as may be provided for in the by-laws. The certificate of association provided that the management of the association should be vested in a board of eight trustees, who were to be elected annually. At first the manager and secretary were appointed by the board of trustees, but in consequence of some friction between the manager and the first board of trustees in relation to the proper mode of conducting the affairs of the association, a resolution was proposed and adopted at the meeting of the association held in January, 1886, providing that the manager and secretary should thereafter be elected annually by the members. It appears that the blank applications for membership then in use by the association

had printed upon them a blank proxy authorizing the person whose name should be inserted therein to act and vote for the member at all meetings of the association, and underneath it was a request to the applicant for membership to sign it in blank, to be filled up by the secretary. In accordance with this request a large number of these proxies were signed in blank and transmitted to the secretary.

It does not distinctly appear whether the proxies thus obtained were ever in fact used at the corporate meetings of the association, nor does it seem to us to be very important whether they were or not. The resolution changing the mode of electing the manager and secretary and making them practically independent of the board of trustees, was adopted mainly by the use of proxies, either the ones indorsed on the applications for membership or others. After the adoption of that resolution, the mere possession by the secretary and manager of a sufficient number of proxies to control all elections and other corporate action and to perpetuate themselves in power, was repugnant to the principles upon which the association was founded, and a clear abuse of the opportunities which their official positions afforded them. It took the control and management of the association from the body to which both the statute and the articles of association committed it, and placed it in the irresponsible hands of two of the subordinate officers.

We can not for a moment suppose that so large a number of applicants for membership signed documents so utterly destructive of the very purposes and objects of the association understandingly and properly appreciating the consequences of their action. The circumstances tend rather to the conclusion that they were led to suppose that the execution of the proxy was a condition precedent to their admission to membership, and that they therefore signed unadvisedly and without understanding or properly considering what they were doing. An improper and unlawful advantage was thus taken of the members on their admission into the association.

After the adoption of the resolution of January, 1886, the board of trustees gave but very little actual attention to the affairs of the association, and that only in a perfunctory manner, and, as we may well assume, at the dictation of the manager and secretary. The latter were the real governing authority, and conducted the business of the association as they saw fit. This was a palpable subversion of the rules of law as well as a fraud upon the members, and justly subjected the association to proceedings by the Attorney General for its dissolution.

The information accuses the officers of the association of false representations as to various matters. Of these one is admitted by the answer, although the fraudulent intent is denied. That consists of issuing certificates of membership numbered, but not consecutively, a particular certificate being thus given a number very much larger than the total number of certificates issued up to that date. The answer alleges that this was done for the purpose of preventing rival associations from ascertaining the amount of business done by the defendant. Whether this was the true purpose or not, there is no evidence that any means were taken to apprise applicants of the actual number of certificates issued, nor does it appear that they had any knowledge on that subject; and as by the terms of the certificates the amount of the benefits payable on the death of a member depended upon the number of members in good standing at the time of his death, the issuing of certificates with numbers much larger than the number of certificates previously issued, had a direct tendency to deceive members receiving certificates as to their value. Whether intended or not, this mode of issuing certificates operated as an actual fraud upon those becoming members, and the result, so far as concerns those actually deceived, was the same as though the misnumbering of the certificates had been adopted with an actual intent to deceive and defraud.

It is also alleged that the annual statement to the Auditor was false in its report of the financial condition of the association. Whether said statement is false or not in the particular pointed out depends upon the right of the association to use the advancé mortuary assessments for current expenses. As we hold that it had no such right, it follows that the statement was incorrect by the amount the mortuary and tontine funds had been depleted by the misappropriation of the advance mortuary assessments. It is urged that this was a mistake of law honestly made, which ought not to subject the association to proceedings by the Attorney General for its dissolution. The provision of the statute prohibiting the use of the mortuary assessments for any other purpose than that of paying death benefits is so plain and unambiguous that an honest mistake of law on that point seems scarcely possible. Besides, we are unable to see how a mistake of law can be set up in such case as a defense. The evidence however tends strongly to the conclusion that there was no mistake, but that the officers of the association acted in the matter with knowledge that they were violating a statutory prohibition. They claim to have taken legal advice, but it is by no means apparent that they took advice except from one of their own number, and it is not clear that such advice was sought in good faith or honestly believed to be correct. Another circumstance tends to the same conclusion, and that is that the officers studiously concealed from the Auditor the fact that they were misappropriating the advance mortuary assessments in the manner above stated.

Again, in the statement to the Auditor, the officers gave a negative answer to the question in the Auditor's blank, whether the association undertook or promised to pay members during life, without regard to their physical condition, any sum of money or thing of value. It appears from what has already been said that this answer was false. The promise to pay to each member at the end of the period of ten years, if he chose

to receive it, his equitable proportion of the reserve or tontine fund, was a promise to pay money to members during life without regard to their physical condition.    So of the answer to the question for what purpose and how the reserve or tontine fund was created.    The answer given was, that it was created for the purpose of meeting the advance of rate at the end of ten years from the date of entry, by reserving twenty-five per cent of the net amount of assessments.    This was correct so far as it went, but was false in suppressing the fact that the fund might be withdrawn at the end of ten years. The suppression of a material fact called for by a question makes the answer as essentially false as would the affirmative assertion of an untruth.

Another, and in our judgment a very material official delinquency is charged in the information, based upon the immethodical if not incorrect manner in which the books of account of the association were kept.    The evidence shows that the books containing the accounts of money received and expended were so confused and unsystematic, that it was difficult if not impossible to derive therefrom any certain information as to the financial affairs of the association.    The experts employed by the Auditor, finding themselves unable to strike any balance from the books, were compelled to construct the accounts for themselves anew out of such original data as they were able to find.    The failure of the officers of a mutual benefit association to keep correct and intelligible books of account, whether such failure results from design, carelessness or want of skill, is a serious breach of official duty.    Such officers are trustees, having funds intrusted to their care, to be safely and honestly kept and administered, not for their own benefit, but solely for the promotion of the laudable objects for which the association is organized.    It is a duty of primary importance incumbent on all trustees, to keep proper accounts of trust funds, for unless that is done, the beneficial owners of such funds are subjected to constant uncertainty as to their rights,

and to a constant liability to be defrauded. Next to the duty of honestly administering a trust fund is that of keeping a true, honest and intelligible account of such administration.

Evidence was introduced tending to sustain various of the other charges made by the information, several of which the court below held to be sustained, and in which conclusion we are disposed to concur. It is unnecessary however for us to protract the discussion, as what has already been said is sufficient to show that in our opinion the decree is fully warranted by the evidence. It will therefore be affirmed.

*Decree affirmed.*