## SUPERIOR COURT OF BALTIMORE CITY.

Filed July 2, 1897.

### THE STATE OF MARYLAND
### VS.
### THE INTERNATIONAL FRATERNAL ALLIANCE.

*Attorney-General Harry M. Clabaugh* and *George R. Gaither, Jr.,* for the State.

*John P. Poe* and *Charles Marshall* for the defendant.

RITCHIE, J.—

This is the second time the Governor of the State has felt called on to

direct the institution of proceedings for the forfeiture of the charter of this defendant corporation. In the first proceeding, in 1893, Judge Wickes, sitting as of this Court, after a thorough examination into the character of this organization, and in a clear and forcible opinion, determined that it was, in violation of its charter, conducting an insurance business under the guise of a beneficial order, and he signed a decree forfeiting its charter.

The Court of Appeals concurred fully with Judge Wickes in the determination that the defendant had been unlawfully conducting an insurance business, but out of consideration for its large number of members and to save them from the losses that might result from a dissolution, reversed the decree which forfeited the charter. 77 Md. 547. The Court, however, at the same time laid before the defendant a plain alternative, viz., either to resort to the appropriate jurisdiction and wind up its insurance business and continue simply as a beneficial order; *or* to amend its charter *under Section 17*, of Article 23, of the Code (for the formation of regular life insurance companies) and Section 38 (allowing incorporation for two or more purposes), and thus "bring itself within the provisions of the insurance laws of the State," and be authorized to carry on both its beneficial and insurance business.

The defendant thereupon amended its charter and continued its insurance business, but whether or not it took the steps pointed out by the Court of Appeals as necessary to enable it to carry on the sort of insurance it was then engaged in, and has since conducted, will be seen later.

This Order was first incorporated in 1888, under Art. 23, Sec. 14, of the Code, "for social, benevolent, fraternal and beneficial purposes," with a lodge system, a ritual, and a capital stock of $5,000. In 1889, it was re-incorporated "for social or fraternal beneficial purposes, or both," omitting the capital stock feature. It was under this charter that the case referred to was heard. After its decision in 1893, the charter was amended, as stated, and the Order incorporated itself also under Section 127 and following sections. This amendment authorized it to "grant and issue insurances" on lives upon the mutual assessment plan, to pay benefits in case of sickness, etc., and also provided for a capital stock of $10,000, divided into one hundred shares. The conditions and limitations upon organizations incorporated under Section 127, were then set out in Section 128, as amended by the Act of 1892, Ch. 488.

In November, 1895, the charter was again amended. The old fraternal beneficial purposes are again retained, and the Order is further re-incorporated under Section 127, &c., and also incorporated under Section 143 E, &c., as set forth in the Act of 1894, Chapter 295. This Act for the first time in our corporation laws used the designation, defined the meaning, and provided for the incorporation of "a fraternal beneficiary association." The purposes set out in the Charter of 1895, in addition to the original purpose of Section 14, are to "grant and issue insurances or benefits upon the lives of individuals," as provided in said Sections 127 and 143 E, &c. The capital stock of $10,000, under Section 128, is retained. Section 127 has been amended by 1894; ch. 258 and Section 128 further amended by 1894, ch. 256, but neither in any respect material to this case. This is the charter now under consideration.

Upon the filing of the petition in this case an order was passed requiring the defendant to show cause why its charter should not be forfeited; it filed its answer and the State has demurred.

It is charged:

First, that the defendant under one act of incorporation is conducting both an insurance business under Section 127 and the business of a "fraternal beneficiary association" under Section 143 E; that from the very nature of such an association as defined in 143 E, it is impossible for its business to be conducted together with the insurance business, and that the attempt to combine the two necessarily involves a violation of its charter as an association, notwithstanding the fact that under Section 38 a company may in general be incorporated for two or more purposes; that even if the two purposes could be united in one corporation, the defendant has violated its charter as a fraternal beneficiary association in that its business as such is not conducted for the sole benefit of its members, that it is conducted for profit,

and that it is has not a representative form of government.

Second, That defendant has been issuing policies for a larger amount than $1,000 upon one life.

Third, That the defendant, in or about the last year (the seventh) of the maturing payment of $700, under the "Golden Cycle" policy, has been and is now levying a note assessment of $650, and that the same is a practical forfeiture of such policies.

Fourth, That defendant is issuing insurance upon the lives of infants under ten years of age.

First. The Double Incorporation.

This defendant is unquestionably incorporated under Section 143 E of 1894, ch. 295, as "a fraternal beneficiary association," as well as for the insurance business under Section 127. The answer is not explicit in either admitting or denying the petition in this respect, but seems to set up the claim that this Order is *within the proviso* of Section 113 E, and apparently, by suggestion rather that averment, seeks to rely on the distinction between being "brought within the terms" of the Act, and being incorporated under it. The proviso provides that certain corporations therein described may, on the condition named, *"conduct their business* in this State *under the provisions* governing fraternal beneficiary societies, orders or associations."* To avail of this privilege does not require re-incorporation of the corporations referred to, nor was any amendment of defendant's charter necessary in order to secure the benefit of the proviso, if the Order was within its terms.

One *important condition, moreover,* is imposed upon corporations that desire the benefit of the proviso, and that is the deposit of $10,000 with the Insurance Commissioner. The answer alleges a deposit of $10,000 with the Commissioner, but the endorsements on the "20 payment" life policy exhibits, and its 1893 charter, show that this $10,000 is the deposit made in that year and required by Section 128, as amended, *for its insurance business.* These policies represent old line life insurance pure and simple, and if authorized, can be so only under Section 128. Besides, the statement was made by the State in argument that the deposit of $10,000 mentioned in the proviso had

never been made, and it was not denied or questioned. But the terms of the charter and the certificate of the Insurance Commissioner inserted in the answer make it perfectly plain that the defendant, in pursuance of Section 143 Q, is incorporated under the Act of 1894 as "a fraternal beneficiary association," and render any further discussion of the question unnecessary.

The defendant is thus an insurance company under Section 127, &c., and a "fraternal beneficiary association" under the Act of 1894.

It is urged by the State that these two purposes cannot be united in one corporation, but, without passing on this question, it may be safely said that where the law attaches certain conditions and limitations to the exercise of any given corporate purpose, those conditions and limitations cannot be destroyed or subverted by combining such purpose with some other under one corporation. If the two cannot be united in a joint prosecution their administration must, at least, be kept separate. The statute will not permit the evasion or abrogation of prescribed requisites and conditions by a scheme of combination.

Among the essential requisites of such an association under the Act of 1894 are (a) that it shall have a representative form of government; (b) that it shall be conducted for the sole benefit of its members and their beneficiaries; (c) that it shall not be conducted for profit.

Let us look now at the organization of this corporation. Its form of government comprises local assemblies, grand assemblies, and the Annual Congress. The active management is vested in a board of ten trustees called "The Cabinet," elected by the Congress. The local assemblies are composed of a certain number of policy and certificate holders, the grand assemblies are composed of delegates chosen by the local assemblies, and the Congress is composed chiefly of delegates chosen by the grand assemblies. The Congress on the face of the last compilation of by-laws (1896) seems to be the supreme authority of the Order, and we have apparently what might be called a representative form of government.

But representative *of whom?* Of those who are members of the benefi-

ciary association? No, but representative of them *and* of the policy holders *both together*. The local assemblies are composed, without distinction, both of those who hold policies of insurance under Section 127 and those who hold certificates for benefits under Section 143 E. By-laws, page 27. In the conduct of business in the local assemblies the policy holders thus have as much part and voice as the members of the association, and of course may at any time antagonize, if not override, their interests. As the organization rests on the local assemblies, this feature of amalgamation pervades the whole system of government up to and including the Congress and Cabinet. This is not the form of government required of this defendant by the Act so far as it is an association. The Act requires that these beneficiary associations shall have a representative form of government *of their own;* that is, one conducted exclusively by their own members and their representatives. This one has *no* form of government of its own, and is apparently subordinated throughout the whole scheme to the insurance interests.

I have said the by-laws of 1896 apparently show a representative form of government, although not such as the law requires, but on page 25 there is a note in fine print which states that "Article 7 of part 2" of the by-laws of 1895 *is still in force.* Turning to this article we find the extraordinary provision that the *stockholders* are authorized to exercise *all the powers conferred upon the corporation,* "anything to the contrary in these by-laws notwithstanding," and may amend or annul the by-laws of the Congress and pass by-laws of their own to govern the corporation. It thus appears that the elaborate so-called representative form of government, such as it is, is a mere sham, if not intended as a deceit, existing only at the pleasure of the stockholders, and that the absolute control both of the insurance and beneficiary business is vested in the handful of men who hold its small amount of insurance stock. This defendant has thus plainly abused its corporate powers with respect to the form of government which the law requires it to maintain so far as it is a fraternal beneficiary association.

The other requisites of such an association have been equally disregarded. The total receipts of the Order from whatever source are placed in one general account (Art. III). Whatever may be needed is drawn from this general account and constitutes a general "expense fund," and the balance is divided into a "benefit" and a "reserve" fund. There is practically no distinction between the last two funds; they seem to be jointly applicable to the payment of benefits, policies, loans, investments and future obligations. The "Building and Loan Insurance" department is fully described in the by-laws of 1895, page 24 (kept in force by 1896, page 25). Thus, without any distinction as to the sources of revenue, the assessments and dues from the members of the association, and the receipts from the insurance business go into one common fund, which is appropriated, alike to all the purposes just mentioned. It is thus manifest from the combined membership of the assemblies, the absolute control of the stockholders, and the intermingling of its beneficiary revenue with that of its insurance business that this Order, so far as it is a fraternal beneficiary association, is not conducted solely for the benefit of its members and their beneficiaries; and it is equally manifest from the manner in which one busines in interwoven with the other, and from the use of the revenue of the association in the insurance and loan business, that its business as an association is carried on for profit.

Second. Policies in excess of $1,000.

When the Court of Appeals, in 1893, saved the charter of this Order, although it had been guilty of an abuse of its powers, it was advised by the Court to wind up its insurance business, or, if it desired to continue that business, to incorporate itself *under Section* 17 (providing for regular life insurance). The Court, of course, was familiar with the Act of 1892, Chapter 488. but the defendant was not referred to that Act for the continuance of such insurance business as it was then conducting. Its chief business then was that represented by its "Golden Cycle" policy. Instead of incorporating itself under Section 17, it incorporated itself *under Section* 127, *&c.* (Section 128 having then been amended by the Act of 1892), and has continued the insurance business through its Golden Cycle and other forms of policies ever since.

Section 128, as then amended (1894, Ch. 256, makes no material change), required the deposit of only $10,000, but it limited the insurance to be issued *to a sum not greater than $1,000 on any one life.*

Now, these Cycle policies, which defendant continued in its business, provide for the payment of $700 at the end of each seven years during the life of the policy. The longest period for which they could be issued is forty-nine years, and, within that limit, for multiples of seven, provided that if the insured dies he gets only the maturing installment. One of these policies issued to anyone between 17 and 25 years of age is an insurance, *not for $700*, but *for $4,900*, payable in instalments of $700 each seven years, in case the insured survives the full period. (See Table, Ex. G. C. P., and By-laws, 1895, page 23). Nor is this all. The by-laws provided that any one member might have *seven* of these policies on his life. Such insurance as this, notwithstanding the forbearance and warning of the Court of Appeals, was again openly conducted within five days after the Court's decision and has been ever since under the pretense that it was authorized by its amended charter.

Since 1893 the defendant has introduced its "20 payment life" and "20 year endowment" policies, and also a "junior form," and is now issuing these. Until January, 1897, it issued the first two forms in varying sums up to $5,000. The maximum was then reduced, but it is still $3,000. The defendant seems never to have paid any regard whatever to the limitation in its charter of $1,000, and it is true, as charged, that it has been abusing its corporate powers as an insurance company ever since 1893.

Third. The assessments on the Cycle Policies.

Under these policies, as stated, a payment of $700 matures every seven years. The issue of them began with the original incorporation in 1888, and their scheme is fully described in the by-laws of 1895, page 22 (continued in force by 1896, page 25). A difference between figures as to stated dues, and lack of data as to assessments, make it impossible to tell accurately what amount is payable on these policies during the first six years, but there is enough to make it safe to say that the payments amount to at least about $300.

It is charged and admitted that in addition to these payments this defendant has been, and is now, at about the beginning of the seventh year, levying upon each of these policies a *note assessment* of $650, so drawn as to mature at the maturity of the $700 payment when the note is to be handed back to the insured *as part of his $700*. Under its by-laws there is no reason why the defendant may not cover the remaining $50, and more, too, with another assessment during the balance of the year, if it chooses to do so. Of course the policy lapses if this note is not given.

While there is no limit in the by-laws upon the defendant's power of assessment, its exercise is nevertheless restricted by the limitation of good faith and a fair construction of its contracts. Such an assessment as this is practical confiscation and a most oppressive abuse of corporate power. Its effect, if not its purpose, is to force a large number of lapses. The defendant may well say that its effort has been "to retire" this class of policies. If, as suggested, this assessment has been made necessary because of the financial condition of the company, then the continued existence of such a corporation would be a fraud upon the corporation law and a pitfall to the humbler classes of the community with whom to a large extent it deals.

The answer asserts that the right to levy this assessment was distinctly upheld by the Court of Appeals in the recent case of Barton against this Alliance. DAILY RECORD, January 18th, 1897. I do not so understand that case. Among other things considered in that case was a scheme then recently adopted for the purpose of enabling the defendant to meet its obligations, of which scheme this $650 assessment was the most important feature. The plaintiffs relied on this scheme as an *admission of insolvency.*

The Court held that the only question they could consider was *insolvency vel non* of defendant; also that the scheme of defendant "undoubtedly stretches the power of assessment to its ultimate limit," but was not an *admission of insolvency.* But, the Court adds, whether it amounts to a *fraudulent conducting* of its business, or *is in excess of its*

*charter powers*, or *fraudulent* in that it enables those who held the earlier policies to appropriate to themselves the available cash in the treasury, leaving the holders of policies of later date either to bear the burden of the heavy assessments or submit to the annulment of their policies, are matters with which *in this proceeding*, for the reason stated, *we are not concerned.*" I can see no justification of this assessment in Barton's case.

Fourth. Infant Insurance.

It is charged and admitted that the defendant also insures the lives of infants under ten years of age; and the tables show that they are insured at the age of two years and upward.

The Code, Section 141, recognizes the general right to issue insurance upon the lives of infants under ten years of age, but the point here made is that insurance on the lives of such infants is contrary to the policy and purposes of such an association as is the defendant, and that the duties, contracts and obligations of membership are of such a character as necessarily to exclude children so young. The authorities as to the eligibility to membership of infants in beneficial associations are in conflict. It is held in Globe Assn. 63 Hun. 263 (affirmed 135 N. Y. 280) and People vs. Industrial, 92 Hun. 311 (149 N. Y. 606) that they are not eligible, and in Mutual Assn. vs. Hunt, 127 Ill. 257, that they are. There is, however, so little before me in this connection that I am unable to accurately determine the status of this infant insurance, nor, in view of what has been said as to the other charges, is it necessary to pass on this question.

On the whole case I think abundant cause has been shown for the forfeiture of this charter. I have, however, been urged by the defendant in argument, in case I found any abuse of corporate powers, to exercise the discretion vested by Section 260 and withhold a final decree of forfeiture, and pass an order requiring the defendant to remedy the grievance out of consideration for the alleged good faith of the trustees or "Cabinet" and the interests of the members. This discretion was exercised by the Court of Appeals in behalf of defendant in 1893, with no better result than repeated violations of its charter ever since, and I see nothing now that appeals to its exercise a

second time. Besides, the abuses complained of are so deep-rooted and widespread, and defendant's mode of conducting its entire business is so interwoven with what is illegal and with its unlawful form of government, that in order to let this corporation continue it would be necessary to practically wipe out everything subsequent to its certificate of incorporation and have it start over again from the beginning.

As to the trustees, I cannot believe that they have been ignorant or innocent of the violations of the charter which in some respects have been committed ever since 1893.

Nine of them were the trustees named both in the certificate of 1893 and that of 1895, and five of the nine were the incorporators under each. As intelligent men and experienced both in the insurance and benefit business, they must have known that the corporation had no powers except such as were set forth in the certificates prepared under their instructions, and that in the exercise of such powers as were conferred, the Order was bound to act in conformity with the special sections under which they saw proper to have it incorporated, and knowing these things they must have been fully cognizant of every violation of the charter that was committed.

From their prominent position and influence in the Order, these trustees, in my judgment, were knowingly and persistently parties to all these abuses of corporate power.

As to the members at large, I have no reason for thinking that their interests would be promoted by a continuance of this corporation. There is nothing in the case to make me assume that the defendant would be less oppressive to them when occasion offered than it has been to those holding the Cycle policies, and I think it would be better for the members to wind up this corporation right now rather than leave them to the hazards of the future.

Being of opinion, therefore, that the defendant corporation has been guilty of the misuse and abuse of its corporate powers and franchises, and that the public interest requires the forfeiture of its charter, I will sign a decree declaring the same forfeited.