## No. 14,119.

INTERNATIONAL SERVICE UNION COMPANY *v.* PEOPLE EX REL.
WETTENGEL, DISTRICT ATTORNEY.

(70 P. [2d] 431)

Decided May 17, 1937. Rehearing denied July 12, 1937.

1

2

Mr. Granby Hillyer, for plaintiff in error.

Mr. Byron G. Rogers, Attorney General, Mr. J. Glenn Donaldson, Assistant, for the people.

*En Banc.*

Mr. Justice Young delivered the opinion of the court.

This action was brought by the people of the state of Colorado on the relation of Earl Wettengel, district attorney of the second judicial district, against the International Service Union Company, a Colorado nonprofit corporation. The action is in the nature of quo warranto for the alleged unlawful exercise of powers by the corporation under its franchise from the state to operate as a corporation not for pecuniary profit. From a judgment in favor of the plaintiff revoking defendant's charter, the defendant prosecutes this writ of error. In this opinion the plaintiff will be designated as the people and defendant as the corporation.

The corporation was organized June 22, 1932, under the Corporations not for Profit Act, comprising sections 2379-2383, C. L. 1921 (sections 172-176, chapter 41, C. S. A. '35). The facts are embodied in a stipulation between the parties. We deem it advisable to set forth the statutes involved and the facts as contained in the stipulation in considerable detail in order to derive a clear understanding of the issues and problems presented.

Section 2381, C. L. 1921 (section 174, chapter 41, C. S. A. '35), in so far as material for our consideration is as follows: "* * * Associations and societies which are intended to benefit the widows, orphans, heirs, and devisees of deceased members thereof, and where the members shall receive no money as profit or otherwise, shall not be deemed insurance companies."

In 1913, subsequent to the enactment of the foregoing statute, section 2533, C. L. 1921 (section 77, chapter 87,

4

C. S. A. '35), was passed. This statute is as follows: "No life insurance company organized upon the mutual assessment plan or which issues contracts, the performance of which is contingent upon the payment of assessments or calls made upon its members, shall do business in this state, except such companies as are now authorized to do business in this state and which shall value their assessment policies or certificates of membership as yearly renewable term policies, according to the standard of valuation of life insurance policies prescribed by the laws of this state, and no such company shall provide in any contract of insurance for any cash or other benefit to accrue to any living member or policyholder or to any beneficiary except a death benefit from life insurance upon the yearly renewable term plan."

Section 2471, C. L. 1921, paragraph (b) (section 1, paragraph [b], chapter 87, C. S. A. '35), defines insurance as follows: "Insurance is a contract whereby one party called the 'insurer,' for a consideration, undertakes to pay money or its equivalent, or to do an act valuable to another party called the 'insured' or to his 'beneficiary,' upon the happening of the hazard or peril insured against, whereby the party insured or his beneficiary suffers loss or injury."

 Since the corporation was not formed under the general corporation laws, but under a special act conferring limited powers on companies organized thereunder, we need not look to its charter to ascertain what powers it may exercise, but to the legislative act, under which it was created. *Rockhold v. Canton Masonic Society*, 129 Ill. 440, 21 N. E. 794.

"The act of incorporation is to a corporation an enabling act; it gives to it all the power it possesses. A corporation is the mere creature of the act to which it owes its existence, and may be said to be precisely what the incorporating act has made it, to derive all its powers from the act, and to be capable of exerting its faculties

only in the manner which that act authorizes.'' Niblack, Benefit Societies and Accident Insurance (2d ed.), §8.

Three forms of contracts written by the corporation are set out in the stipulation: One for individual protection; one for individual protection with accident benefits, and one denominated ''Whole Family Protection at Net Cost.'' It is stipulated that the greater number of the more than four thousand contracts outstanding are of the latter type.

The corporation concedes that issuance of accident benefit contracts was not within its powers; it is stipulated that it has discontinued writing them, and that only twelve of such contracts remain in force. As to the death benefit features, the three contracts differ in no essential respect. We set forth therefore, only the material portions of the contract written for whole family protection. So far as here material that contract is as follows:

''Certificate No. Monthly payment
 ''International Service Union Company
 ''Denver, Colorado
 ''Whole Family Protection at Net Cost

''This certificate witnesseth, that the International Service Union Company, a corporation duly organized under the laws of the State of Colorado, and not for pecuniary profit, for and in consideration of the membership fee of $4.00, and $1.00 registration fee, receipt of which is hereby acknowledged and in further consideration of the covenants and representations made in the application for membership, duly executed by the holder of this certificate, and in accordance with the by-laws of this corporation, duly adopted by its members, which, by such reference thereto, are incorporated herein, made a part hereof, and the further payment of the monthly payments required to be paid under the provisions of this certificate and the application for same, for the purposes and within the time specified during the life of this membership certificate, the said company will, upon the satisfactory proof of death of one, only member of the

family named in the certificate, pay to the beneficiary or beneficiaries entitled thereto, such sum or sums of money from the mortality fund, as provided for by the by-laws of the corporation, determined by the age of the deceased at the time of death, to-wit:

"The following amounts are payable under this certificate in accordance with the age at the time of death.

Age 2 to 5 years, amount $ 200.00
Age 6 to 9 years, amount $ 300.00
Age 10 to 14 years, amount $ 400.00
Age 15 to 20 years, amount $ 600.00
Age 21 to 25 years, amount $ 800.00
Age 26 to 31 years, amount $1000.00
Age 32 to 40 years, amount $ 800.00
Age 41 to 50 years, amount $ 600.00
Age 51 to 55 years, amount $ 500.00
Age 56 to 59 years, amount $ 400.00
Age 60 to 64 years, amount $ 300.00
Age 65 until death, amount $ 200.00

"The company will pay the above death benefits on the death of one member only. In case of two or more deaths occurring at the same time, the company will pay the death claim of the oldest member deceased named in the certificate in accordance with the terms of said certificate and by-laws governing payment from the mortality fund. In case of death within the first four months the company will pay one-fourth of the maximum amount. In case of death occurring any time within the second four months the company will pay one-half of the maximum amount. In case of death occurring within the third four months, the company will pay three-fourths of the maximum amount. Beginning at the end of the first year and thereafter the maximum amount will be paid on this certificate. The company reserves the option of paying benefits accruing under this certificate on a monthly basis not to exceed twelve monthly payments.

"Payments

"This death benefit certificate is based upon monthly payments in advance but may be paid in lump sum quarterly, semi-annually, or annually, in advance. Should the advance payment option, as above mentioned, be exercised, and in case of death before such advance payments have been fully used, the company will return in addition to the death benefit paid, all the amount of excess monthly payments received. All monthly payments must be paid at the home office of the company, Denver, Colorado, or to a representative of the company, but in any case, only in exchange for a company's receipt therefor, signed by a duly elected officer of the company, and countersigned by such representative."

Other provisions in the contract provide ten days grace in monthly payments, the conditions for reinstatement after default, the exclusion from benefits of daughters and sons of the family who marry, a provision as to who shall be included and excluded in the case of the marriage of a man and woman with children by a former marriage, the effect of the dissolution of families by separation and divorce, certain restrictions as to military service and death occurring by aeronautics, exceptions as to suicide, a standing notice of members' biennial meetings, a provision to whom the benefits due shall be paid, certain general provisions with respect to the manner in which the contract may be modified, misrepresentations, assignment, etc. Written on the back of the policy is the following:

"Net Cost Provision

"When twelve consecutive monthly payments have been made upon this certificate and the same has been in full force and effect for that time, expense of management and the payment of death losses shall be deducted from the amount of the monthly payments actually received and the surplus will be apportioned by board of directors who will issue a certificate showing the amount credited to the owner of this certificate." The certificate

is signed by the president and secretary and is issued upon payment of $4 as a membership fee, $1 as a registration fee and $1 to continue the certificate in effect for the first thirty days.

The application for membership required before the issuance of the foregoing certificate contained a proxy to R. G. Collison one of the incorporators of the company to vote for the member at all meetings of the corporation.

Paragraph 2 of the stipulation of facts is as follows: "That at all times herein mentioned defendant's sole object and purpose has been to afford to the widows, orphans, heirs and devisees of its deceased members, a form of mutual benefit protection, hereinafter more particularly described. That there are no social, charitable or benevolent features in the organization or operation of the defendant, the member being dealt with on a strictly business basis. That defendant has acted under the authority claimed to exist in the aforesaid corporation not for profit act and particularly that portion of section 2381, C. L. 1921, which provides as follows: '* * * Associations and societies which are intended to benefit the widows, orphans, heirs, and devisees of deceased members thereof, and where the members shall receive no money as profit or otherwise, shall not be deemed insurance companies.' And accordingly, the defendant has never submitted itself to the supervision of the State Insurance Departments of Colorado or elsewhere as an insurance company."

On November 28, 1933, subsequent to the organization of the defendant company, a corporation known as the International Agency Company was formed under the general corporation laws of the state, R. G. Collison above mentioned being one of the incorporators. At all times prior to the institution of this action he held a sufficient amount of the voting stock in the agency company to control its policies. Reference will be made to this corporation as the agency company.

From the organization of the corporation on June 22,

1932, to the time of the formation of the agency company, Collison, under a contract never reduced to writing but evidenced by a minute on the books of the corporation, acted as general agent for the corporation, and received for his services the membership fee, and fifty per cent of all monthly payments of the members for the first year of membership and thirty per cent of all monthly payments received thereafter, out of which he was to defray all expenses of the agency, leaving in the "mortality fund" of the corporation and subject to call, fifty per cent of each monthly payment received on the first year's monthly payments and seventy per cent of all monthly payments received thereafter. Upon the formation of the agency company, a formal contract was entered into between the corporation and the agency company embodying in general the terms of the prior informal contract with Collison. Under this contract the funds of the corporation other than such as the agency company was to receive under the contract were left with the agency company as the "agent and trustee" of the corporation to be used by the agency company in the payment of claims under the several outstanding benefit certificates. It was further provided that the agency company "shall at all times have on hand, either in cash or property which within a reasonable time can be converted into cash, that portion of all sums received by it as payments payable to the said second party [the corporation] from its members * * * required to be applied to the payment of any and all claims accrued to members in good standing of said second party." The contract further provided that the agency company should apportion any surplus money that might from time to time accumulate due to economy in management or savings on mortality to the owners of benefit certificates in good standing.

Since it is stipulated that there are no social, benevolent, charitable or fraternal features in the organization or operation of the corporation, and since it has

no lodge system, it is excluded from the insurance laws relating to fraternal benefit societies; namely, sections 2599-2633, C. L. 1921 (sections 169-203, chapter 87, C. S. A. '35).

The contract above set out is one of insurance under the definition given in section 2471, C. L. 1921 (section 1, chapter 87, C. S. A. '35), supra. It is stipulated that the corporation deals with its members on a strictly business basis. The relationship, therefore, between the corporation and its members must be determined from the contract. We find such relationship to be that of insurer and insured. *State v. Vigilant Ins. Co.,* 30 Kan. 585, 2 Pac. 840; *Chartrand v. Brace,* 16 Colo. 19, 26 Pac. 152; *Supreme Lodge v. Davis,* 26 Colo. 252, 58 Pac. 595; *Woodmen v. Sloss,* 49 Colo. 177, 112 Pac. 49. "The law will, when occasion requires, look behind the names of societies, and pass its judgment upon their schemes and modes of business. If the prevalent purpose and nature of an association, of whatever name, be that of insurance, its legal character will not be changed by the benevolent or charitable results to its beneficiaries. A society, which by contract agrees to pay to the beneficiary of a deceased member a sum of money, is a mutual insurance company, whatever may be the terms of payment of the consideration by the member, or the mode of payment of the sum to be paid in the event of his death." * * * "A corporation with salaried officers, paying commissions on risks obtained, insuring and admitting to membership any one having the requisite conditions of age and health, and requiring no other qualification for membership, can not evade the insurance laws by calling itself a benevolent society and obtaining a charter as such." Niblack Benefit Societies and Accident Insurance (2d ed.), §3.

The corporation describes the contract as "Protection at Net Cost." The monthly payments by the members, like all insurance premiums, are voluntary. They are to be made at the rate of $1 per month per

member; and written into the contracts with the members, into the by-laws, and into the contract between the corporation and the agency company are provisions that such savings as may be made by actual mortality being less than expected and by economy of management, shall be credited to the beneficiary and a certificate issued to him showing such credit. This certificate entitles the member to cash, or to have the amount applied on future monthly dues or he might, if desired, apply it to the purchase of class C stock in the agency company. If applied to the latter purpose the agency company was to hold 70 per cent of the amount with the ultimate objective of forming a legal reserve insurance company when enough money was secured. The people contend that such action contravenes section 2383, C. L. 1921 (section 176, chapter 41, C. S. A. '35) which contains the following provision: "No dividend or distribution of the property of any such corporation, association or society shall be made until all debts are fully paid, and then only upon its final dissolution and surrender of organization and name, nor shall any distribution be made except by a vote of the majority of the members."

Assuming that the money returned in such manner is money belonging to the corporation, we think the people's contention is sound, for its return is not on the dissolution of the corporation nor is it conditioned on its being authorized by a majority vote of the members as the statute requires. Assuming that the money returned does not belong to the corporation, but is merely an excess collection from the member, it in effect makes the corporate plan of operation merely the writing of insurance on the mutual assessment plan. The assessments are limited to $12 per year and all that is saved by economy of management and on lessened mortality is returned to the contract holder. This is equivalent to assessing the member for the expenses of operation and mortality costs with a permitted maximum assessment of $12 per year. This in substance is mutual assessment life insurance

12

and is prohibited by section 2533, C. L. 1921 (section 77, chapter 87, C. S. A. '35), supra. In either view of the matter, whether the return be considered a dividend of the corporation or as a return of an excess assessment the corporation is operating contrary to law.

██ ██ In view of the fact that a nonprofit corporation might adopt numerous plans which would benefit widows, orphans, heirs and devisees of deceased members, we cannot hold that the statute under which nonprofit corporations are permitted to dispense such benefits, and providing that they shall not be considered insurance companies, is repealed by implication by section 2533, C. L. 1921 (section 77, chapter 87, C. S. A. '35), supra. We think this latter statute has the effect of restricting the means by which such a corporation may dispense its benefits to the extent that it is prohibited from writing insurance on the mutual assessment plan.

██ The people further contend that the contract with the agency company, whereby it was authorized to perform all the work that would otherwise devolve upon the trustees of the corporation, was an unlawful delegation of powers. It will be noted that among the powers delegated were the procuring of members, the collection of dues, the safekeeping of the funds, the obligation to keep the mortality fund in money or property readily convertible into cash, and the apportioning, crediting and paying of mortality savings and savings in management to the members. If this contract were carried out there would be but little if anything for the corporation to do, and little that its trustees could do while the contract was in force. We think this contravened section 2382, C. L. 1921 (section 175, chapter 41, C. S. A. '35), which reads as follows: ''Corporations, associations and societies (not for pecuniary profit) formed under the provisions of this act, shall elect trustees, directors or managers from the members thereof, at such times and places and for such a period as may be provided by the by-laws,

who shall have control and management of the affairs and funds of the corporation, society or association.''

The corporation argues that through its control of the agency company, by the corporation's board of trustees, it does exercise all the functions that the foregoing section imposes on its trustees. Conceding, for the purposes of argument merely, that some control might thus be exercised, we confess that it places a considerable strain on our credulity to believe that it would be exercised, with Mr. Collison holding all the proxies of all the members of the corporation, thus controlling its board; and at the same time sitting on the board of the agency company, a profit corporation, and holding a majority of the voting shares of that company and being in a position to select that board and control its policies. As a trustee of the nonprofit corporation charged with the management of its affairs and funds and to see that no member makes a profit, he delegated those trust obligations first to himself and later to the board of a profit corporation of which he was a member, and as such, obligated to see that the stockholders of the second corporation do make a profit. It has been said, ''No man can serve two masters.'' *Chicago Mutual Life Indemnity Ass'n v. Hunt*, 127 Ill. 257, 20 N. E. 55, is in point. There, virtual management and control was vested in the manager and secretary; here, it is in the agency company.

The sole relationship existing between the corporation and its members rested on contract; the status was that of insurer and insured. The corporation was not a benevolent association or society, but a mutual assessment life insurance company. *National Colored Aid Society v. State ex rel.*, 208 Ind. 380, 196 N. E. 240; *Berry v. Knight Templar and Masons Life Indemnity Co.*, 46 Fed. 439. The district court properly found, ''That the defendant is not an association or society which was intended to benefit the widows, orphans, heirs and devisees of deceased members thereof, but was and is a business association, and is not a nonprofit associa-

tion or society within the contemplation of the above mentioned statute.'' Judging the whole plan of operation by its effect rather than its form, we think there can be no doubt that it was a business venture, in the carrying out of which the organization of the nonprofit corporation was but one of the incidents in furtherance of the business objectives of the incorporators. A corporation purely for business purposes may not organize and operate under the nonprofit act. *People ex rel. v. Rose,* 188 Ill. 268, 59 N. E. 432.

Under the facts and applicable principles of law, the judgment of the trial court revoking the corporation's charter was proper and accordingly it is affirmed.

MR. JUSTICE HILLIARD not participating.