CATHOLIC ORDER OF FORESTERS *vs.* COMMISSIONER OF INSURANCE.

Suffolk.   December 1, 1925. — June 29, 1926.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & SANDERSON, JJ.

*Fraternal Beneficiary Corporation.   Commissioner of Insurance.*

At the time of the influenza epidemic of 1918, a foreign fraternal beneficiary corporation found it necessary to seek additional cash to meet extraordinary death claims. It then had $8,000,000 in securities as a death fund but, owing to World War conditions, their market value was unfavorable for sale. The corporation, therefore, pledged its securities for a loan of $1,125,000, paying $23,434 as interest in 1918 and 1919, which was less by $2,000 than was received by it as income on the securities. The loan ultimately was paid and the securities were restored to the death fund. The interest so paid was not returned to that fund and the commissioner of insurance in 1924 refused to issue a further license to the corporation. *Held*, that the payment of interest in the circumstances was in effect a payment of money for death claims and was not a use of the death fund for "expenses" in violation of G. L. c. 176, § 14; and that the action of the commissioner with regard thereto was unwarranted.

For a period of years previous to July 1, 1922, a foreign fraternal beneficiary corporation was proceeding toward actual insolvency and ultimate dissolution because it was not upon a sound system of contribution rates or of financial security, and its officers and other persons interested in it constantly endeavored to induce it to adopt a scientific and sound system of contribution rating and to accumulate adequate reserve funds. A special convention was held in February, 1922, at which time the corporation held two funds, a death fund of about $10,700,000 and an expense fund of about $11,300. A readjustment of the plan of contributions and of the funds of the society, to become effective July 1, 1922, then was adopted and the death fund was reallocated by being divided into a reserve benefit fund and a surplus reserve fund. In March, 1922, the surplus reserve fund was further subdivided, one subdivision being called "readjustment fund," from which was expended about $120,500 for the purpose of educating the members to appreciate the advantages of the new system, and to pay various

charges, commissions, salaries and advertising expenses incidental thereto, all such disbursements having been made before July 1, 1922. No such disbursements were returned to the death fund. The commissioner of insurance refused to issue to the corporation a license to do business for the year 1924–1925 on the ground that such expenditures were a violation of G. L. c. 176, § 14. *Held*, that

(1) Such use of money which had been collected for death purposes was a use of it for "expenses" and was not a lawful charge against the fund, was in excess of the powers of the corporation and was illegal;

(2) No "good and sufficient reason" in excuse or in justification of the violation of G. L. c. 176, §§ 13, 14, had been presented to the commissioner by the corporation, even though the expenditure was for the "use and benefit of the society" and such considerations had been thought sufficient by the insurance commissioners of all other States, including the superintendent of the corporation's home State, where the identical disbursement was questioned under statutes identical to G. L. c. 176, §§ 14, 41, 43, and on an identical presentation of "good and sufficient reasons";

(3) The commissioner acted within the authority conferred upon him by § 43 and the reasons given by him were neither arbitrary nor capricious.

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on April 17, 1925, for a writ of certiorari reviewing and quashing action of the respondent in refusing to the petitioner a license to transact business within the Commonwealth in the year 1924–1925.

The facts were agreed upon. Material facts are stated in the opinion. The case was reserved by *Wait*, J., upon the petition, the respondent's return and the agreed statement of facts for determination by the full court.

*A. Landis* of Tennessee, (*C. H. Waterman, H. A. Bradshaw* of Alabama, & *E. S. Cummings* of Illinois with him,) for the petitioner.

*J. R. Benton*, Attorney General, & *R. Clapp*, Assistant Attorney General, for the respondent, submitted a brief.

PIERCE, J. This case is before the court on a reservation of a single justice upon a petition for certiorari, the respondent's return thereto and an agreed statement of facts. There is no contention by the respondent that certiorari is not a proper proceeding by which the action of the commissioner may be reviewed.

Under date of September 29, 1924, the respondent insurance commissioner made the ruling against the petitioner

which follows: "I refuse to issue a license to transact business, within the Commonwealth, to the Catholic Order of Foresters, a fraternal benefit society, organized under the laws of Illinois. In compliance with the requirements of General Laws, Chapter 176, Section 41, I hereby state as my reasons for such refusal that it appears from the information given in the schedules of the annual report of the society, as of December 31, 1922, that the society, in 1922, transferred from its mortuary fund to the surplus revenue fund $8,693,-421.25, that $160,000 of this money was transferred to the readjustment fund of said Order and said fund to the amount of $120,567.70, after such transfer, was used for the purposes of paying the expenses involved in making a readjustment of the Order and that the Order has paid from the mortuary fund, the sum of $23,434.02, for interest due on borrowed money, and that the moneys so transferred and disbursed in part as aforesaid, have not been restored or replaced in the mortuary fund of the Order."

G. L. c. 176, § 41, reads: ". . . When the commissioner refuses to license any society or revokes its authority to do business in the Commonwealth as provided in section forty-three, he shall reduce his ruling, order or decision to writing and file the same in his office, and shall furnish a copy thereof, together with a statement of his reasons, to the officers of the society upon request, and the action of the commissioner shall be reviewable by proper proceedings in any court of competent jurisdiction in the Commonwealth; provided, that this section shall not prevent the society from continuing in good faith all contracts made in the Commonwealth during the time when it was legally authorized to transact business therein."

G. L. c. 176, § 13, provides: "Any society may create, maintain, invest, disburse and apply a death fund, any part of which may in accordance with the by-laws of the society be designated and set apart as an emergency, a surplus or other similar fund, and a disability fund. Such funds shall be held, invested and disbursed for the use and benefit of the society, and no member or beneficiary shall have or acquire individual rights therein, or become entitled to any part

thereof, except as provided in section sixteen, seventeen or nineteen. The funds from which benefits shall be paid shall be derived and the fund from which the expenses of the society shall be defrayed may be derived from periodical or other payments by the members of the society and accretions of said funds; provided, that no society shall be incorporated, and no society not authorized on January first, nineteen hundred and twelve, to do business in the Commonwealth shall be admitted to transact business therein, which does not provide for stated periodical contributions sufficient to meet the mortuary obligations contracted, when valued upon the basis of the National Fraternal Congress Table of Mortality as adopted by the National Fraternal Congress August twenty-third, eighteen hundred and ninety-nine, or any higher standard, with interest assumption not more than four per cent per annum, except societies providing benefits for disability or death from accident only"; and § 14: "Every provision of the by-laws of the society for payment by members of such society, in whatever form made, shall distinctly state the purposes of the same and the proportion thereof which may be used for expenses, and no part of the money collected for mortuary or disability purposes or the net accretions of either or any of said funds shall be used for expenses."

Section 16 in substance provides that certain death funds created under § 13 may grant extended or paid up protection to its members; § 17 in substance provides in certain contingencies for an equitable distribution of surplus; and § 19 in substance provides the manner of the payments of the death benefits.

The essential facts taken from the agreed statement of facts are as follows: The petitioner is a foreign fraternal benefit society, organized under the laws of the State of Illinois, and it transacted business in the Commonwealth of Massachusetts under annual licenses from June 18, 1898, until September 29, 1924, when its application for a license for the year 1924–1925 was denied. The original plan of the order provided for a so called "level" rate of assessment of an equal amount for all members, regardless of the insurance

cost as affected by age and risk.   No provision was made for the increase in cost which inevitably comes with the advance in the age of members.   Assessments were levied as needed to meet claims for current death losses, without regard to the large and constant increase in the contingent liability of the order.   This increase of liability was concealed and delayed by the rapid growth of the order from thirty thousand members in 1895 to one hundred and sixty-one thousand in 1920.

In the year 1918 the influenza epidemic caused great and unanticipated death losses to all insurance organizations of the country.   The death rate for 1918 per thousand members was seventeen, as against ten and seven tenths for 1919, 1920.   To meet those extraordinary death claims it became necessary to secure additional cash.   The petitioner held more than $8,000,000 in securities as a mortuary fund, which it had the right and power to convert into cash for the payment of death claims.   The market value of the securities was unfavorable, due to World War conditions.   To meet these claims the petitioner pledged the securities for a loan of $1,125,000 at a rate of interest less than the interest realized on the pledged securities.   The loan was secured and the money so obtained was used for the payment of death claims. The interest on the pledged securities was paid, as it had previously been, into the mortuary fund and exceeded by $2,000 the sum which was withdrawn from the fund to pay the interest on the loan.   The interest so withdrawn during the years 1918 and 1919 was $23,434.02.   The loan ultimately was paid by the society and the securities restored, but the $23,434.02 taken from the fund to pay the interest on the loan has never been restored to the mortuary or any other fund of the order.

The first question for decision is, Did the expenditure by the petitioner from its mortuary fund of the sum of $23,434.02 as a payment for interest on borrowed money, without an ultimate restoration of such sum to the mortuary fund, in view of all the circumstances disclosed by the agreed statement of facts and the schedules of the annual report of the society as of December 31, 1922, justify a refusal by the

commissioner to issue it a license? The contention of the commissioner is that such use was a violation of G. L. c. 176, § 14, in that the expenditure was a payment of an expense and not a payment of a death benefit; while the petitioner contends that the payment was, in effect, a payment of death claims, and should be held to have been such and not to have been "used for expenses." In the circumstances we are of opinion that the use of the mortuary fund to pay interest upon a loan expended entirely to pay death claims was in effect a payment of death claims and not an "expense" which should have come out of an expense account or, when paid, returned to the mortuary fund. It follows that the license should not have been refused because of the use to which the $23,434.02 was put, nor on the ground that having been so used it had "not been restored or replaced in the mortuary fund of the Order."

In 1918 the officers of the society, and other persons interested in it who had some understanding of life insurance principles and actuarial requirements, constantly endeavored to induce the society to adopt a scientific and sound system of contribution rating and to accumulate adequate reserve funds. The society was not upon a sound system of contribution rates or of complete financial security. This was known to its officers and had been presented to every convention of the members of the order since 1900, and various measures had been adopted from time to time tending to better its financial condition, but all had proved insufficient to secure the complete solvency of the company. At the regular convention of the petitioner held in August, 1921, an effort was made to secure a readjustment of contributions and funds upon the basis of complete financial solvency. No action was then taken but a readjustment plan was discussed and referred to a special convention of the petitioner in February, 1922. At this special convention it was voted to make a readjustment of the plan of contributions and of the funds of the society, to become effective July 1, 1922. Prior to July 1, 1922, a campaign of education of its members was undertaken by the society to secure the general acceptance of its proposed reorganization scheme. This was an

expensive matter, and money was expended upon it during the year 1922 subsequent to the meeting of the special convention in February.

Before the institution of the new plan, the society had its moneys divided into two funds only, an expense fund and a mortuary fund. At the end of the year 1921 the mortuary fund amounted to $10,507,197.17 and the expense fund to $3,033.57. On February 21, 1922, the date when the reallocation of the funds of the society was authorized, the mortuary fund had increased to $10,655,980.19; and the expense fund to $11,260.67 — an accumulation from assessments in subordinate lodges. By a reallocation on February 21, 1922, the death fund of $10,655,980.19 was divided into two classes, (a) a reserve benefit fund of $1,962,559.94; and (b) a surplus revenue fund of $8,693,421.25. On March 21, 1922, the surplus revenue (b) was split up and transferred to other classifications of funds: $228,910.71 to a benefit fund for payment of accrued claims; $7,144,054.08 to the reserve benefit fund of the re-rated members, to enable the petitioner to maintain the integrity of their contribution rates provided under the plan of readjustment in respect of assigned credits (these assigned credits represented the present value between the tabular contribution rates and the reduced rates granted, under the re-rating, to the members who entered prior to January 1, 1913); $714,405.41 (being ten per cent of such assigned credits) was transferred to a surplus reserve benefit fund in the way of a buffer against contingencies (safety fund); $160,000 was transferred to a "Readjustment Fund," and the payment therefrom of $120,567.70 was the disbursement objected to by the respondent.

The $120,567.70 above referred to was expended by the officers of the society for the purpose of educating its members to appreciate the advantages of the new system, and to paying various charges, commissions, salaries and advertising expenses incidental thereto; $21,085.96 of the said amount was spent upon the convention of February, 1922, that adopted the readjustment plan — delegates received travel and hotel accommodations free at the expense of this fund — and sums were given from the readjustment fund to various

local subdivisions of the society and to members of the High Court and the Supreme Lodge of the order to pay their travelling expenses. A tabulation of the manner in which the $120,567.70 was spent, taken from the annual statement of the society as of December 31, 1922, on file in the department of insurance, appeared in detail in the agreed statement of facts. The amount so spent has not been restored to the mortuary or to any other fund of the order. This sum was spent prior to July 1, 1922, when the new plan became effective.

"Before the new plan became effective and during the period when this sum was being disbursed, the society was headed toward ultimate dissolution, — toward 'actual' insolvency (as distinguished from 'actuarial' insolvency). The adopted plan for readjustment pointed the way toward 'actuarial' solvency and corporate permanency. The accomplishment of solvency and permanency resulted from the education of the members to the merits of the readjustment . . . . During the period when the readjustment fund was being disbursed, the society was still solvent, but it could not have continued to operate under the old plan without becoming insolvent shortly. The expenditure of this sum of $120,567.70 did not actually reduce the total assets of the society to such figure that it was insolvent during the period of its expenditure, but if the new plan had not been in fact adhered to by the members after July 1, 1922, the society would not have been able to discharge its obligations . . . . All the expenditures made for interest charges and for readjustment expenses were authorized by regularly taken votes of qualified representatives of the society, and were all duly authorized by appropriate provisions of its constitution or by-laws . . . . It is agreed that the return of the respondent is a true return and accurately sets forth the record of proceedings in the premises . . . . It is agreed that the petitioner was solvent on September 29, 1924 . . . . It is agreed that the commissioner of insurance notified the proper officers of the order after the receipt of its annual statement of January 1, 1919, and in the years 1920, 1921, 1922 and 1923 that the expenditure of the sum of

$23,434.02, mentioned in paragraph 4, for interest charges, was unlawful, under the statutes of the Commonwealth, that the annual returns of the order should be amended so as to show a decrease in the expense fund of the order by said amount, and that said sum should be replaced by the order in the mortuary fund, but that the order has not complied with the notifications of the commissioner."

G. L. c. 176, § 43, referred to in § 41, *supra*, reads: "When the commissioner, on investigation, is satisfied that any foreign society has exceeded its powers, or has failed to comply with any provision of this chapter, or is conducting business fraudulently, or is not carrying out its contracts in good faith, he shall notify the society of his findings, and state in writing the grounds of his dissatisfaction, and, after reasonable notice, shall require the society, on a date named, to show cause why its license should not be revoked. If, on the date named in said notice, such objections have not been removed to the satisfaction of the commissioner, or the society does not present good and sufficient reasons why its authority to transact business in the Commonwealth should not at that time be revoked, he may revoke the authority of the society to continue business therein." Under G. L. c. 176, §§ 13 and 14, and G. L. c. 176, §§ 41 and 43, upon the agreed statements of facts in substance quoted, *supra*, four questions for decision are presented: (1) Whether under §§ 13 and 14 the petitioner exceeded its powers in the use made of $120,567.70 taken from $160,000, which in turn was taken originally from the death fund of $10,655,980.19 as such fund existed in February, 1922; (2) Whether the commissioner was justified in the determination that the $120,567.70 was taken from the mortuary fund; (3) Whether the use of the money taken from the death fund for readjustment expenses was an "expense" within the prohibition of G. L. c. 176, §§ 13 and 14; and (4) Whether the provision of G. L. c. 176, § 43, that "the commissioner . . . may revoke the authority of the society to continue business" in this State is mandatory or discretionary, and if discretionary whether such discretion was exercised properly, that is, not arbitrarily or capriciously.

The petitioner, acting in accord with its by-laws, was authorized by G. L. c. 176, §§ 13 and 14, to designate and set apart an emergency, a surplus or other similar fund, and a disability fund, from moneys in a unit fund collected for mortuary or disability purposes, provided said funds were not used for "expenses." In the case at bar, the moneys used in the "campaign of education" and in the "accomplishment of solvency and permanency" were taken from a so called "Readjustment Fund" which was taken from a fund called "Net Free Surplus," derived from the "Death Fund," each new fund being a part of the death fund until separated therefrom under a new terminology and classification. The provision contained in § 13, *supra*, that "Such funds shall be held, invested and disbursed for the use and benefit of the society," is applicable to every and all parts of the mortuary fund, however any part thereof may be described, and does not relate solely to that part called an "emergency or surplus fund" as the petitioner seems to contend. Moreover all funds made out of the mortuary fund under the authority of § 13, *supra*, are charged with the special interest therein which may accrue to members under the provisions of G. L. c. 176, §§ 16, 17, and 19. The contention of the petitioner that the moneys which were expended in furtherance of the readjustment scheme were not an "expense" in the sense in which that word commonly is used, and that therefore the expenditures were not within the prohibition of G. L. c. 176, § 14, cannot be accepted; nor can the further contention of the petitioner be adopted that the violation of G. L. c. 176, §§ 13, 14, if there were such, "was purely technical and restricted to the veriest letter of the law, having no element of viciousness, nor of harmful effect, nor of detrimental results, nor of purpose or intent to go beyond statutory authority."

If we assume with the contention of the petitioner that the authority to revoke the license of the petitioner to continue business in this State is discretionary in the commissioner, under G. L. c. 176, § 43, we do not think the society presented to him "good and sufficient reasons" in excuse or in justification of the violation of §§ 13 and 14, *supra*, even

though the expenditure was for the "use and benefit of the society"; and such considerations have been thought sufficient "by the insurance commissioners of all other States, including the superintendent of the home State, where the identical disbursement was questioned under identical statutes to §§ 14, 41 and 43 and on an identical presentation of 'good and sufficient reasons.'"

It follows that the use of the money which had been collected for mortuary purposes was not a lawful charge expense against the fund from which it was taken, was in excess of the powers of the society and was illegal. *Chicago Mutual Life Indemnity Association* v. *Hunt*, 127 Ill. 257. *Wolf* v. *Gegenseitige U. G. Germania*, 149 Wis. 576. It further follows that the commissioner acted within the authority conferred upon him by G. L. c. 176, § 43, and that the reasons given therefor are neither arbitrary nor capricious.

*Petition dismissed.*