ATTORNEY GENERAL *vs.* NEW ENGLAND ORDER OF PROTECTION.

Suffolk. May 7, 8, 1942. — August 5, 1942.

Present: FIELD, C.J., DONAHUE, QUA, DOLAN, & RONAN, JJ.

*Fraternal Benefit Society.*

Under G. L. (Ter. Ed.) c. 176, § 14, salaries of the members of the committee in charge of the mortuary fund of a fraternal benefit society, disbursements by the members of the committee made in the performance of their duties but not distinctly attributable to specific items of accretion to the fund, the salary of the committee's clerk, and the cost of financial publications and credit reports procured to aid the committee in their work, were improperly paid from the fund; but expenses specially attributable to collecting specific sums for the fund, such as legal expense in enforcing delinquent payments of mortgage interest and "coupon collection expenses," might properly be paid from the accretions to the fund.

INFORMATION, filed in the Superior Court on January 26, 1942.

The case was reported by *Williams*, J.

*R. Clapp*, Assistant Attorney General, for the Attorney General.

*C. H. Loring*, (*R. H. Wilkinson* with him,) for the respondent.

QUA, J. This information is brought under G. L. (Ter. Ed.) c. 176, § 47, at the relation of the commissioner of insurance to restrain a fraternal benefit society incorporated under that chapter from making disbursements for certain expenses out of its mortuary fund and to require

it to restore to the fund sums already paid from it for such expenses.

The facts have been agreed. Those essential to a decision may be stated summarily. The society has two funds, the general expense fund and the mortuary fund. Both funds are made up by direct assessments on members and from "certain charges . . . specified in the by-laws." The by-laws provide for an investment committee whose duties are to protect and care for the assets in the mortuary fund, to determine investments to be made and "accretions thereto," to inspect real estate owned by the society or upon which it holds mortgages, to determine upon renovations and repairs, to foreclose mortgages, to determine upon the renting or sale of foreclosed properties, to examine the security portfolio, to determine the safety of investments and the advisability of changes, and to preserve "the physical assets of the securities owned by the society." This committee "performs such other incidental acts as are usually necessary in the investment, supervision and care of substantial assets." It consists of four members, the secretary-treasurer, the "chairman," and two others. The secretary-treasurer is paid out of the general expense fund. In 1940 the "chairman" received a salary of $500. The two other members received salaries of $450 each. All members of the committee received in 1940, in addition to their salaries, their actual cash disbursements for expenses incurred in performing their duties above described, amounting to $427.16. The salaries of the committee members other than the secretary-treasurer and the expenses of all the members, amounting in all to $1,827.16, were "charged against the accretions" to the mortuary fund. These expenses seem not to have been attributable separately to the various separate items of accretion, and no contention has been made that they were. The compensation of the committee was solely for services in the care of the mortuary fund and for no other purpose. In 1940 the committee employed a clerk. He kept the investment account and the books of account. He secured data as to the descriptions of the properties and assessed values, attended to

keeping the properties insured, to notifying mortgagors of interest due, and to collecting interest payments. He' followed up delinquent mortgages. He made the various returns required by governmental agencies. His entire duties had to do with the care of the mortuary fund. His salary was charged against the accretions to that fund. The committee, in order to assist it to invest the funds intelligently and safely, subscribed to various financial publications and secured credit reports on prospective mortgagors. The expense of this, amounting to $295.50, was paid from accretions to the mortuary fund. It is stated in the agreed facts that none of the items of expense hereinbefore mentioned was "used for the general operating expenses of the society." Out of each monthly assessment levied upon the members, fifteen cents of each $1,000 is allocated to the general expense fund. This fund is used to pay salaries of salaried officers and employees and for rent, light, heat, telephone, stationery, expenses of securing new business, and incidental expenses of a similar nature.

Section 13 of c. 176 of the General Laws provides for the creation by fraternal benefit societies of death funds and disability funds and speaks of the "funds from which benefits shall be paid" as if such funds were intended to be distinct from "the fund from which the expenses of the society shall be defrayed." Then follows § 14, which reads, "Every provision of the by-laws of the society for payment by members of such society, in whatever form made, shall distinctly state the purposes of the same and the proportion thereof which may be used for expenses, and no part of the money collected for mortuary or disability purposes or the net accretions of either or any of said funds shall be used for expenses."

. The question to be decided is whether "net accretions" to the mortuary fund have been used "for expenses" contrary to the prohibition of § 14. We think that they have been.

Accretions which have become fully absorbed into the mortuary fund have been paid out of it for items of expense not incurred as a necessary condition of the receipt of any

particular moneys but incurred rather as general expenses of doing the business in which the society is engaged. The facts agreed make it plain that this is so, notwithstanding the statement hereinbefore quoted that none of these items was "used for the general operating expenses of the society." The respondent urges that it is only "net" accretions which may not be used for expenses and argues from this that the general expenses of preserving and managing the mortuary fund as a whole may be deducted from accretions, and that what is left after such expenses are paid constitutes the "net" accretions. We cannot accede to this argument. The distinction between "gross" and "net" in other connections is of little value here. Practically the entire business of these societies, in so far as the law concerns itself with them, consists in acquiring, managing, and preserving the funds out of which the benefits are paid. The primary purpose of the legislation included in c. 176 is to safeguard these funds and thus to protect the beneficiaries for whose necessities the members have sought to provide. The law is little interested in the social and fraternal aspects of these societies or in other activities carried on by them. We think that the "expenses" which by § 14 are not to be paid out of the mortuary or disability funds are not confined to payments for rent, heat, regalia, and similar items, but that they include the general expenses of doing the business which the society was incorporated to carry on and therefore include the general expenses incident to supervising, preserving, and managing these funds. If § 14 meant less than this it would accomplish very little. In *Catholic Order of Foresters* v. *Commissioner of Insurance*, 256 Mass. 502, at page 511, it was held that moneys expended in furtherance of a "readjustment scheme" were paid in violation of § 14.

This construction of § 14 does not deprive the word "net" of all significance. In the case last cited, at pages 506–507, it was held that interest paid on money borrowed by the society to avoid selling its securities in an unfavorable market at a time of extraordinary death claims could be charged against the mortuary fund, and the payments

next to be referred to in the present case furnish another and more apt illustration.

It is further stated in the agreed facts that "certain legal expenses" incurred "in enforcing delinquent payments of mortgage interest in the total sum of $61.90," and "coupon collection expenses in the sum of $69.51," were paid from the accretions to the mortuary fund. There is no further explanation of these items. If these expenses were necessary in order to bring into the mortuary fund collections which could not otherwise have been secured, so that they are fairly describable as special expenses of collecting identified sums, we think that an amount representing the collection cost may be treated as never having become in reality a part of the "net" accretions, and that there was no impropriety in those payments. So far as appears this was the fact.

A final decree is to be entered enjoining the respondent, its officers and agents, from paying or causing to be paid from the mortuary fund the salaries of its investment committee, the general expenses not specially and distinctly attributable to separate items of accretion incurred by its members in carrying out their duties, the salary of the clerk employed by the committee, and the cost of financial publications and credit reports for the committee's use; and ordering the respondent, its officers and agents, to cause the sums already paid out of said fund for said purposes as set forth in the agreed facts to be restored to the fund.

*Ordered accordingly.*